CHRISTINA J. BROWN, Cal. Bar. No. 242130
cbrown5@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Tel: (202) 326-2125

JOHN D. JACOBS, Cal. Bar. No. 134154
Local Counsel
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
Tel: (310) 824-4300

*Attorneys for Plaintiff Federal Trade Commission*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHERN GLAZER'S WINE AND SPIRITS, LLC,<br><br>Defendant. | **Case No.** 8:24-cv-02684<br><br>**COMPLAINT**<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**<br><br>**ACTION SEEKING NATIONWIDE RELIEF** |

COMPLAINT

## I.    NATURE OF THE CASE

1.    Defendant Southern Glazer's Wine and Spirits, LLC ("Southern") is the largest coast-to-coast distributor of wine and spirits in the United States. For years, Southern has violated the Robinson-Patman Act by selling wine and spirits to small, independent "mom and pop" businesses at prices that are drastically higher than the prices Southern charges large national and regional chains. Southern's discriminatory pricing practices have victimized independent and family-owned neighborhood grocery stores, local convenience stores, and other independent retailers across the country.

2.    Southern has been the largest U.S. wholesaler of wine and spirits every year for the past ████. In 2023, Southern's sales grew to approximately $26 billion, making it one of the ten largest privately held firms in the entire country. At present, Southern sells one out of every three bottles of wine and spirits purchased in the United States. In some states, Southern's share of wine and spirits sales is so large that Southern operates as the gatekeeper for the majority of wine and spirits sold in those states.

3.    As the single largest distributor of wine and spirits in the United States, Southern has harmed small businesses by charging them far higher prices than national or regional chains. For instance, Southern routinely charges small, independent retailers as much as ██% to ██% more for the same bottles of certain wine and spirits than national and regional chains in the exact same geographic area. These independent retailers include neighborhood grocery stores, local convenience stores, and independently owned wine and spirits shops.

4.    In fact, discriminatory pricing is deeply engrained in Southern's business strategy. In one instance, Southern employees discussed ████

████████████████████████

███████████████████████████████

██████████████████████████. In another

COMPLAINT

1

instance, █████████████████████████████████████

████████████████████████████████████████████

█████████████████████.” In yet other instances, Southern █████████████████

██████████████████████████████████████

██████████████████.

5.      These are not one-off instances of unlawful price discrimination. Instead, internal Southern documents confirm that ████████████████████████

████████████████████████████████████████████

███████████████████████████.” Moreover, this price discrimination in favor of large national chains is not justified by differences in Southern's cost of distributing products to the different retailers, nor does it reflect bona fide attempts to meet prices offered to chain retailers by competing distributors.

6.      Southern's pricing practices are paradigmatic violations of the Robinson-Patman Act. Congress enacted the Robinson-Patman Act in 1936 to address a concern that large sellers were favoring newly arisen large corporate chains due to their greater purchasing power and granting them special prices, exclusive discounts, and secret rebates that the sellers withheld from smaller rivals. Congress feared that discriminatory prices on offer to only a small clique of "Goliath" chain corporations would undercut, impede, and eliminate competition from local, community-based businesses selling the same products. Ultimately, this process would leave just "a few economic overlords to whom everybody else owes economic allegiance."[1]

7.      As the Supreme Court explained in the seminal case *FTC v. Morton Salt Co.*, 334 U.S. 37, 43 (1948), "[t]he legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large

---

[1] *See* Remarks of Rep. Wright Patman introducing H.R. No. 8442, 79 Cong. Rec. 9077 (June 11, 1935); Remarks of Rep. Sumners, Debate in the House of Representatives on H.R. No. 21 8442, 80 Cong. Rec. 8109 (May 27, 1936).

COMPLAINT

buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price."

8.      Accordingly, Section 2(a) of the Robinson-Patman Act requires a level playing field, making it illegal for sellers to reduce competition by charging higher prices to disfavored customers that purchase commodities of like grade and quality, except where justified by differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which the commodities are sold or delivered to those purchasers, changed market conditions, or a good faith attempt to match a competing offer.

9.      Small, independent retail businesses are a critical component of the American economy and provide valuable alternatives to megastore chains—to the great benefit of consumers, communities, and competition. For many years, Southern has harmed, and it continues to harm, smaller grocery stores, convenience stores, and other independent retailers by charging them higher prices as compared to large national and regional chains.

10.     The Federal Trade Commission brings this action (i) to ensure that small, independent retailers served by Southern have access to the same discounts, rebates, and pricing as the large chains that they compete directly against, except to the extent justified by actual cost differences, changed conditions, or a good faith effort to meet a competitor's equally low price, and (ii) to obtain an injunction prohibiting further price discrimination by Southern against these small, independent businesses. When Southern's unlawful conduct is remedied, large corporate chains will face increased competition, which will safeguard continued choice for American consumers.

COMPLAINT

## II.   THE PARTIES

11.   Plaintiff Federal Trade Commission ("FTC") is an independent administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 et seq., and with its principal offices in Washington, D.C. The FTC is vested with authority and responsibility to enforce, inter alia, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 2 of the Clayton Act, 15 U.S.C. § 13, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate federal court proceedings to enjoin violations of any law the FTC enforces, including Section 2 of the Clayton Act, as amended by the Robinson-Patman Act. Since its enactment in 1936, the FTC has brought over 1,400 actions to enforce the Robinson-Patman Act.

12.   Defendant Southern Glazer's Wine and Spirits LLC is a Delaware corporation with its principal place of business located in Miami, Florida.

13.   Southern is the largest wholesale distributor of wine and spirits in the country. The company was formed in 2016 from the merger of Southern Wine & Spirits of America, Inc. and Glazer's, Inc. Each company had grown through a series of acquisitions of other distributors leading up to 2016, including Premier Wine & Spirits, World Class Wines, Olinger Distributing, The Odom Corporation, Star Distributors, Phoenix Wine & Spirits, Stoller Wholesale, Victor L. Robilio Co., Sterling Distributing, Alliance Beverage of Alabama, and Alliance Beverage of Mississippi. The merger of Southern Wine & Spirits and Glazer's gave the combined firm the largest service area of any U.S. wine and spirits distributor, with operations in 44 states and the District of Columbia. The company's announced acquisition of Horizon Beverage Group will expand its footprint into a total of 46 states.

14.   Southern distributes over ███ items and over ███ different stock keeping units ("SKUs"), including top selling spirits brands such as Patron Silver Tequila, Jim Beam Bourbon, Jameson Irish Whiskey, Aviation Gin, Bacardi

COMPLAINT

Rum, Grey Goose Vodka, Tito's Vodka, and Fireball Cinnamon Whiskey, and top-selling wine brands like Kim Crawford, Josh Cellars, Duckhorn, Stella Rosa, and La Marca.

15.    Southern controls a significant share of wine and spirits sales in numerous states. In Washington, for example, Southern estimated its share of statewide sales at ██% for spirits and ██% for wine. Southern estimated its share of statewide sales in Texas at ██% for spirits and ██% for wine, and in California at ██% for spirits and ██% for wine.

## III.    JURISDICTION AND VENUE

16.    This complaint is filed, and these proceedings are instituted under the provisions of Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

17.    This Court has subject matter jurisdiction over this action pursuant to Sections 5(a) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 53(b), 28 U.S.C. §§ 1331, 1337(a), and 1345.

18.    This Court has personal jurisdiction over Southern because Southern has the requisite constitutional contacts with the United States of America pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

19.    Southern's general business practices and the unfair methods of competition alleged herein are activities in or affecting "commerce" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44, and Sections 1 and 2 of the Clayton Act, 15 U.S.C. §§ 12-13.

20.    Southern is, and at all times relevant herein has been, a corporation, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

21.    Venue in this district is proper under 15 U.S.C. § 22; Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); and 28 U.S.C. §§ 1391(b), (c) and (d). Southern is found, resides, transacts business, and/or has agents in California and in this

COMPLAINT

District, and a portion of the affected commerce described herein has been carried out in California and in this District. Southern has a significant presence throughout California, including in Southern California and this District. In 2022, Southern sold over ████ different items to more than ████ off-premise retail customers in Southern California, with sales totaling over $ ████ .

## IV.    ROBINSON-PATMAN ACT

22.    Subject to certain defenses, the Robinson-Patman Act, 15 U.S.C. § 13(a), makes it illegal for distributors and manufacturers to charge disfavored customers higher prices than those charged to favored customers for commodities of like grade and quality where the effect may be to lessen competition. This suspect conduct is known in antitrust law as "price discrimination."

23.    Each wine and spirit sold by Southern is a commodity within the meaning of Section 2(a) of the Robinson-Patman Act amendments of the Clayton Act, 15 U.S.C. § 13(a).

## V.    WINE AND SPIRITS INDUSTRY BACKGROUND

24.    Wine and spirits are generally sold in the U.S. through a non-integrated distribution system regulated by each state and requiring three distinct tiers. Producers in the first tier—including distillers, vintners, and importers (collectively, "suppliers")—may sell their wine and spirits only to distributors in the second tier. Distributors then re-sell the wine and spirits to retailers in the third tier, which then sell the products to consumers.

25.    State regulatory regimes for wine and spirits fall into three broad categories: open, franchise, and control. In open states, distributors buy wine and spirits from suppliers and re-sell to retailers. Distributors also provide marketing and promotional services to both suppliers and retailers. In franchise states, distributors provide similar services, but once a supplier selects a distributor, the relationship becomes a franchise as a matter of state law and can be terminated only for cause. In control states, by contrast, suppliers sell directly to the state, and

COMPLAINT

state-run agencies handle distribution and often retail sales; traditional distributors are limited to providing marketing services or serving as brokers for suppliers. This lawsuit concerns Southern's conduct in open and franchise states.

26. In some or all of the open and franchise states in which Southern operates, Southern serves as the distributor for many of the largest wine and spirits suppliers, including Fifth Generation (Tito's Vodka), Constellation Brands (Svedka Vodka, Kim Crawford Sauvignon Blanc), Sazerac Co. (Buffalo Trace Bourbon, Fireball Cinnamon Whiskey), Pernod Ricard (Jameson Irish Whiskey, Absolut Vodka), Bacardi U.S.A. (Patron Silver Tequila, Grey Goose Vodka, Bacardi Rum), Diageo (Smirnoff Vodka, Aviation Gin), Suntory Global Spirits (Jim Beam Bourbon, Maker's Mark Whiskey), Deutsch Family Wine & Spirits (Josh Cellars), Delicato Family Wines (Noble Vines), E&J Gallo Winery (Clos du Bois, Barefoot), and Treasury Wine Estates (19 Crimes). Southern typically enters into exclusive distribution agreements with these suppliers that cover either a single state or multiple states. Southern represents numerous suppliers' brands in the same wine or spirits category in a state. For example, in Texas, Southern sells and distributes ███ different vodka products from █ different suppliers. In Washington, Southern sells and distributes ███ different vodka products from █ different suppliers.

27. With limited exceptions, only retailers may sell to end consumers. Retailers include state licensed businesses selling wine and spirits to consumers either for on-premise consumption (e.g., bars or restaurants) or off-premise consumption (e.g., grocery stores, convenience stores, or other retailers). This lawsuit concerns Southern's sales to off-premise retailers. Southern generally classifies off-premise customers as either chain retailers (including both national and regional chain retailers) or independent retailers.

28. Southern generally sells products to retailers pursuant to ████████
████████████████████████████████████████████████████████

COMPLAINT

7

█████████████████████████████████████████

████████████████████████.

29.     Southern's sales to off-premise retailers totaled approximately $██

███ in 2022. Southern's largest off-premise chain customers include large wine and spirits retail chains like Total Wine, Binny's, Spec's, and BevMo, large grocery chains like Kroger and Albertsons, national club stores like Costco and Sam's Club, and national megastore chains like Walmart and Target. Stores operated by these large retail chains often draw customers from ██████████

████████████████████████████████.

30.     Southern's chain customers often purchase products from Southern through █████████████████████████████████

█████████████████████████████████

████████████████. Southern assigns dedicated teams of employees to support its key chain customers.

31.     Southern's independent off-premise customers differ in size. Some operate a single store and others a handful of locations. They include neighborhood grocery stores, local convenience stores, and local wine and spirits shops. Independent retailers typically purchase wine and spirits directly from Southern in one of three ways: placing orders directly with a Southern sales representative assigned to their store and other stores, placing orders through Southern's online platform called "Proof," or direct purchases picked up from a Southern warehouse. In some states, independent retailers also are permitted by state law to participate in purchasing cooperatives or "co-ops," which allow them to pool their purchases with other independent retailers. Even with the use of co-ops, however, independent retailers often do not receive the same favorable prices offered to large, favored retailers by Southern.

COMPLAINT

8

1

## VI.   SOUTHERN'S UNLAWFUL PRICE DISCRIMINATION

32.    Beginning at least as early as 2018 and continuing through the present, Southern has repeatedly discriminated in price between disfavored independent purchasers and favored large chain purchasers of wine and spirits located in both rural and urban areas throughout open and franchise states, including but not limited to areas such as ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. In reasonably contemporaneous transactions, Southern charged significantly higher prices for identical bottles of wine and spirits to disfavored independent retailers than to favored large chain retailers that are in proximity to and in active competition with the disfavored retailers for the resale of wine and spirits to the same pool of end consumers. The favored large chain store and the disfavored independently owned store are often located within just a few blocks to a few miles of each other. These purchases often occurred within ████████████████████ ████████████████████████████. Favored chain retailers ████████ ████████████████████████████████████████████ ████████████████████████████████████.

33.    These disparities in pricing are not justified by differences in Southern's cost of providing goods to the large chain retailers and the independent retailers—whether in terms of economies of scale or the logistics of delivering the goods to different sized stores. Nor are these pricing differences supported by a need for Southern to match prices being offered to chain customers by competing distributors.

34.    In short, Southern has engaged in a sustained course of discriminatory pricing in violation of the Robinson-Patman Act. For example, Southern's sales

COMPLAINT

invoice data shows that in 2022, independent retailers located in ██████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████.

### A.    Southern's Mechanisms of Price Discrimination

35.    Southern's discriminatory prices to favored chain customers are effectuated through a variety of mechanisms. Those mechanisms include large, high-volume quantity discounts, cumulative quantity discounts, ████████████, scan rebates, ███████████████, ████████████████████████, ██████████████████████████████, and ██████████, █████████████████████████████████.

36.    In some instances, Southern ████████ accepts money or "discount support" funding from suppliers in return for providing discriminatory pricing ███ █████████████████████████████. This money or funding is not associated with any efficiency derived from the differing methods or quantities in which the wine or spirits are manufactured, sold, or delivered to the favored large chains.

37.    The cumulative consequence of Southern's strategies is that Southern routinely charges higher prices to smaller independent businesses as compared to megastore chains and other large national and regional retailers.

#### 1.    Large Quantity Discounts

38.    Southern often sets the deepest available discounts at quantity purchase levels that only a few specific large chain customers can attain and that are not justified by cost savings achieved by Southern.

39.    Some quantity discounts offered by Southern require purchases of █████ to ██████ cases at a time. In some instances, Southern referred to the largest quantity levels associated with these deals as ██████████████████████ ████████████████████████████████"). In addition,

COMPLAINT

10

Southern's ███████████████ includes many deals █████████████
███████████████████████████.

40.    In numerous instances, Southern gave favored large chain retailers
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████.

41.    Southern's large, high-volume quantity discounts forced disfavored
independent retailers to pay significantly higher prices than favored large chain
retailers purchasing the same products and created significant retail pricing and
margin advantages for large chain retailers in the resale of those products to end
consumers.

## 2.    Large Cumulative Quantity Discounts

42.    Southern often allows favored large chain retailers to combine
purchases over a specified period to qualify for cumulative quantity discounts. In
numerous instances, these cumulative quantity discounts were offered ████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████. Large chain retailers were able to qualify for these
cumulative volume thresholds by combining purchases across many stores or by
utilizing warehouses. In contrast, small independent retailers often operate only a
single store or handful of locations and generally have limited storage space.

43.    These cumulative quantity discounts often were ████████████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████.

44.    For example, in California in 2022, Southern awarded favored
retailers ████████, █████, and ████████ credits totaling more than $████████,
$████████, and $████████ associated with cumulative quantity discounts for

COMPLAINT

their respective purchases of wine and spirits. In contrast, during the same period, Southern awarded ███████████████ in California ████████ $ ████████ in credits associated with cumulative quantity discounts.

45.    To provide one stark example, for purchases of ████████ ██████████████████ in 2022, Southern ████████████████████ ████████████████████████████. During the same period, Southern ████████████████████████████ ██████████ $ ████ to $ ████████. In 2022, ████████████████ ████████████████████████████ $ ████████████████ ████████████████.

**3.    Scan Rebates**

46.    A scan rebate is a price reduction given to a retailer's customer at the register for each bottle of a certain brand or product purchased (e.g., $2 off per bottle of Tito's Vodka). The retailer is reimbursed dollar-for-dollar by the supplier or Southern for each scan discount extended to customers.

47.    ████████████████████████ ████████████████████████████ ████████████████████████ ██████████.

48.    In one instance in California in 2019, the scan rebate for retail sales of ████████████████████████ ████████████████ $ ████████████████ ████████████████████ $ ████████. In other words, ████████████████████████ ████████████████████████.

49.    Southern often awards favored large chain retailers scan rebates that are not made available to competing disfavored independent retailers. For example, in Arizona, ████████████████ $ ████████ $ ████ in

COMPLAINT

12

scan rebates, ████████, largely from January through August 2023. In Illinois,
████████████████████████████████████████████████████
$████████████████████████████████████████████ in
2020. In contrast to these large chain retailers, independent retailers generally do
not receive scan rebates.

      **4.** ████████████████████████████████

    50.   In several states, Southern ████████████████████
████████████████████████████████████████████████."
For example, in California, ████████████████████████████
██████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
██████.

    51.   Internal Southern documents confirm that ████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████."

    52.   In addition ████████████████████████████████
████████████████████████████████████████████████████. For
example, in August 2020, Southern ██████████████████████ $████████
████████████████████████████████████████████
██████ $████████████████████████████████████ $████████████

COMPLAINT

13

████████████ $█████████████████████████████████

████████████████████ .

53.    By way of further example, in June 2023, Southern ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ $████████████████

████████ $█████████████████████████████████████

██████████████████ .

**5.**    ████████████████████████████████

54.    At times, Southern ██████████████████████████

████████████████████████████████████████████████

████████████████ . For example, in March 2023, Southern ████████████

████████████████████████████████████████████████

████████████████████████████████████ . In

another instance, in January 2023, Southern ████████████████████

████████████████████████████████████████████████

████████████████████████ .

**B.    Exemplar Instances of Southern's Price Discrimination**

55.    Southern's substantial and sustained price discrimination can be seen

through a sampling of specific product examples.

**1.    ████████████████ (California and Arizona)**

56.    From 2018 to present, Southern has consistently sold ████████

████████████████████████████████████ in

California and Arizona at prices ██████████████████████████

████████████████ . In 2022, Southern provided ████████████████████

to ████████ in California that resulted in ████████ paying effective net prices

COMPLAINT

of approximately $ ██ per bottle. At the same time, Southern charged ████████

████████████████████████████████████████ that purchased full

cases and competed with nearby ████████████ in California net prices of up

to $ ███ to $ ███ per bottle, or as much as $ ███ ( ██%) to $ ███ ( ██%)

per bottle than ████████. Indeed, $ ███ per bottle was the price most commonly

paid by ████████████ in California in 2022, and over ██% of ████████

████ paid ████████ this price. Southern acquired ████ bottles of ████

████████ from ████████████████████████████████████

████████████████████████████████████████████████.

57.    In Arizona, Southern provided ████ a ████████████████

████████ tied to a ██-case (or ████ bottle) purchase requirement that resulted

in an on-invoice net price of approximately $ ███ per ████ bottle for ████

████████ from September 2018 through at least October 2023. Southern also

extended the $ ███ price to ████ for purchases of ██ cases ( ███ bottles) to as

████ cases ( ██ bottles) at a time. Similarly, in 2021 and 2023, Southern

provided ████████ the same effective net price of $ ███ per bottle tied to a

██-case (or ████ bottle) purchase requirement for the same product. Southern

likewise extended the $ ███ price to ████████ purchase of ████ cases ( ██

bottles) at a time. Southern acquired ████ bottles of ████████████ from

████████████████ specifically ████████████████████

████████████████████████████████████████████████

████████████████.

58.    In contrast, from September 2018 to at least October 2023, Southern

generally charged ████████████████████████████ that purchased full

cases in Arizona approximately $ ███ to $ ███ for ████ bottles of ████████

████, even when purchasing ████████ cases ( ██ bottles) at a time. Southern thus

charged ████████████████████ as much as $ ███ ( ██%) to $ ███ ( ██%)

per bottle ████████████████████ for the identical product in

COMPLAINT

Arizona over a five-year period. The price most commonly paid by ███████ ███ in Arizona in this period was $███ per bottle—$███ (██%) ███ per bottle than ████████████—and more than ██% of ████████████ paid ████ this price.

**2.** ██████████████████████ **(Illinois and California)**

59. ████████████████████ is the most popular ██████████ product in the United States. Southern has consistently sold ████ bottles of this ██ to ██████████████████ in Illinois and California at ██████████ ████████████████████████. For instance, in Illinois in 2022, Southern charged ████ a net price of $██ per bottle while Southern typically charged ██████████████████████ ████████ net prices of $███ to $███ per bottle, or up to a ██% ████████████ ████████ for purchases of full cases. $███ per bottle was the price most commonly paid by ████████████ in Illinois in 2022, and over ██% of ████████████ paid this price. This ████████████ was attributable to █████████████████████████████████ ████████████████. Southern acquired ████ bottles of ██ █████████████████ from ████████████████████████████ █████████████████████████████████ ██████████.

60. Similarly, in California in spring 2022, Southern charged █████████ a net price of $███ per bottle (████████████████████████████), while Southern charged ████████████████████ net prices of as much as $████ to $███ per bottle, or up to a ██% ████████████ for purchases of full cases. The price most commonly paid by ████████████ in California in 2022 was $███ per bottle—up to $███ (██%) ███ per bottle than ████████████—and over ██% of ████████████████ paid ████████ this price. Southern acquired ████ bottles of ████████████████

COMPLAINT

16

1  from █████████████████████████████████████████

2  ██████████████████████████████████████████████.

3      **3.**    ████████████████   **(Illinois and California)**

4      61.    From 2018 to present, Southern has consistently sold ████████

5  ████, a ███████████████████, to ██████████████████ in Illinois

6  and California at ████████████ net prices ██████████████████

7  ███████. For instance, in 2022, ███████ paid on-invoice net prices of

8  approximately $███ to $████ per ████ bottle for █████████████. During

9  this same period, Southern charged ████████████████████████████

10 ██████████████████ with locations near ████████████ in Illinois on-invoice

11 net prices of as much as $████ to $████ per bottle for the identical product, or

12 $████ (██%) to $█████ (██%) ████████████████ for purchases of full cases. The

13 price most commonly paid by ████████████████ in Illinois in 2022 was $████

14 per bottle—$█████ (███%) ████ per bottle ██████████████████—and over

15 ███% of ██████████████ paid ████████ this price. Southern acquired ████

16 bottles of ███████████████ from ██████████████████████████████

17 █████████████████████████████████████████████

18 ██████████████████████.

19      62.    Notably, ████████████████████████████████████

20 █████████████████████████████████████████████████

21 █████████████████████████████████████████████████

22 █████████████████████████████████████████████████

23 █████████████████████████████████.

24      63.    Similarly, in California during 2022, Southern charged ██████ a net

25 invoice price of ██████ $████ per ██████ bottle of ████████████████. When

26 ████████████████████████████████████ $███ per bottle

27 are ████████, █████ paid ████████ $████ per bottle. In contrast, Southern

28 charged ████████████████ in proximity to ████████████ in California as much

COMPLAINT

as $███ per bottle, or an $███ ███%) ███████████████████████ ███████ for purchases of full cases. The price most commonly paid by ██████████ in California in 2022 was $█████ per bottle—$███ (██%) ████ per bottle ██████████████████—and nearly ██% of ██████████████ paid ████ this price. Southern acquired ████ bottles of ████████████████ from ████████████████████████████████████████████ ████████████████████████████████████████████.

4.    **Other** ████████████ **(California)**

64.    Southern's analyses show that, in California in 2022, Southern charged ████████████████████████████████████████ for ████ bottles of numerous other ████████████.

| Item | Chain Price | Independent Price | Premium Paid by Independents | Percent Difference |
|---|---|---|---|---|
| ███████████████ | ████ | ████ | █████ | ███ |
| ███████████████ | ████ | ████ | █████ | ███ |
| ███████████████ | ████ | ████ | █████ | ███ |
| ███████████████ | ████ | ████ | █████ | ███ |

████████████████████████████████████████████ ████████████████████ within California in 2022. ██████████ ████████████████████.

65.    The foregoing examples illustrate a broader pattern of Southern ████████████████████████████████████████ ████████████████████████████████████████ ████████████.

C.    **Lack of Functional Availability and Lack of Justification**

66.    Many discounts and deals offered by Southern to favored chain retailers are not functionally available to disfavored independent retailers. Such discounts are not offered to independent retailers on a systematic basis. For example, Southern ████████████████████████████████████████

COMPLAINT

18

1  ████████████████████████████████████████████████

2  ██████.” Another Southern document ███████████████████████

3  ████████████████████████████████████████.”

4       67.    Disfavored independent retailers frequently are not informed about the

5  large quantity discounts, cumulative quantity discounts, ████████, and scan

6  rebates available to favored chain retailers, even when it may be logistically

7  feasible for the independent retailer to participate in the deal.

8       68.    The largest quantity deals often ████████████████████████

9  ████████████████████████████████████████.

10  Southern executives acknowledge that ███████████████████████

11  ██████████████████████████████████████████

12  ██████████████████████████████████████████

13  ████████████████████████████████████████

14  ██████████████████████████████████████████

15  █████████████████████████████████████.

16       69.    In other instances, ████████████████████████

17  █████████████████████████████████████████

18  ████████████████████████████████████████

19  ██████████████████████████████████████████

20  ████████████████████████.

21       70.    Even when a discriminatory deal or discount program is made known

22  to all competing retailers by Southern, these discounts often are not functionally

23  available to disfavored small, independent retailers. Generally, independent

24  retailers cannot buy the volume necessary to achieve the highest discounts due to

25  their smaller storage space, lack of funds needed to purchase such quantities, and

26  lower turnover of products. In other instances, disfavored independent retailers

27  expressed interest in buying at the higher-volume quantity discount levels to secure

28  the deeper discounts, but Southern declined to make those deal levels available to

COMPLAINT

the independent retailers.

71.    The discriminatorily higher prices Southern charged disfavored independent retailers were not justified by cost savings Southern accrued doing business with the favored chain retailers. That is, the pricing differentials between favored and disfavored retailers exceed any cost savings achieved by Southern when selling and delivering wine and spirits to the favored national chains.

72.    Nor were the discriminatory pricing and benefits Southern provided to favored chain retailers a good faith attempt to meet, but not exceed, the equally low price of a competing distributor of wine and spirits.

73.    Similarly, Southern's discriminatory pricing provided to favored large chain retailers does not reflect a response to changing conditions affecting the market for or the marketability of the wine or spirits concerned.

## VII.  HARM TO COMPETITION

74.    In each instance of price discrimination alleged herein, the disfavored independent retailer(s) competed with the favored large chain retailer(s) in the same geographic area(s) for sales of identical bottles of wine and spirits to the same pool of end consumers. Indeed, Southern's own executives ███████████ ███████████████████████████████████████████████████████████ ███████████████.

75.    Southern's acts of price discrimination involved substantial price differences between competing retailers (i.e., a ████████████████████████ ████████████████████████) in ██████ of transactions ███████████████ ██████. In certain transactions, ████████████████████ paid as much as ██% to ██% ███████████████████████████. Southern has made repeated discriminatory sales of wine and spirits to disfavored and favored retailers across many states from at least January 2018 through the present.

76.    In many instances, the price discrimination was so significant that the favored chain stores were able profitably to re-sell Southern products at retail

COMPLAINT

prices below the wholesale prices paid by disfavored independent retailers to procure from Southern the exact same bottle of wine or spirits.

77.    The effect of Southern's price discrimination has been or may be substantially to lessen and impede competition in the retail sale of wine and spirits, or to injure, destroy, or prevent competition between such favored and disfavored retailers in the same geographic areas that sell the same products to the same pool of end consumers.

78.    Disfavored independent retailers have been damaged by Southern's price discrimination. As a result of Southern's unlawful practices, independent retailers have lost sales and customers to favored large chain retailers, have been unable to be price-competitive with favored large chain retailers so as to attract customers, have sold lower volumes of wine and spirits than they would have sold in the absence of price discrimination, and have made lower profits on the products they did sell.

## VIII.  IN COMMERCE

79.    In each instance of price discrimination alleged herein, Southern has engaged and is now engaging in commerce, as defined in the Clayton Act, as it sells, distributes, ships, or causes to be shipped wine and spirits produced overseas or in one state of the United States to customers located in other states and in the District of Columbia.

80.    Southern purchases wine and spirits from out-of-state or overseas producers, and then re-sells the wine and spirits to retailers in other states, without any transformation of the products, in a continuing flow of interstate commerce across state boundaries. The wine and spirits products are, and were, sold for resale and consumption within the United States.

81.    In many instances, Southern places orders from suppliers ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

COMPLAINT

21

1   ████████████████████████████ also work with suppliers to develop

2   product plans and distribution goals, ██████████████████████████

3   ██████████████████████████.

4       82.   In most instances, Southern ████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████████████████████████

8   ██████████████████████.

9       83.   The demand for wine and spirits from █████████████████

10  ██████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████

13  ██████████████████████████████████

14  ████████████████████.

15      84.   Based on the foregoing circumstances, the wine and spirits purchased

16  and sold by Southern remain in the flow of interstate commerce so as to be

17  considered "in commerce" for purposes of the Robinson-Patman Act because:

18      a.   Southern purchases wine and spirits from suppliers ████

19  ██████████████████████████████████████████

20  ██████████████████████████████████

21  ██████████████████████████;

22      b.   Southern purchases wine and spirits from suppliers █████

23  ████████████████████████████████████████████

24  ██████████████████████████████████████

25  ████████████████████████████████████████

26  ██; and/or

27      c.   Southern purchases wine and spirits from suppliers █████

28  ██████████████████████████████████████████,

██████████████████████████████.

## COUNT ONE

### (Robinson-Patman Act, 15 U.S.C. § 13(a))

85.    Each of the allegations in paragraphs 1 through 84 are incorporated in this Count One as if fully set forth herein.

86.    The acts and practices of Southern set forth in paragraphs 1 through 84 above constitute unlawful price discrimination in violation of Section 2(a) of the Robinson-Patman Act amendments to the Clayton Act, 15 U.S.C. § 13(a), and will continue in the absence of the relief herein requested.

## COUNT TWO

### (Section 5 of Federal Trade Commission Act, 15 U.S.C. § 45)

87.    Each of the allegations in paragraphs 1 through 84 are incorporated in this Count Two as if fully set forth herein.

88.    The acts and practices of Southern set forth in paragraphs 1 through 84 above constitute unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and will continue in the absence of the relief herein requested.

## PRAYER FOR RELIEF

WHEREFORE, the FTC respectfully requests that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and as authorized by its own equitable powers:

1.    Enter final judgment against Defendant Southern Glazer's Wine and Spirits LLC;

2.    Grant the FTC preliminary and permanent injunctive relief;

3.    Order Southern to cease and desist from price-discriminating, within the meaning of Section 2(a) of the Robinson-Patman Act, by selling its products to any purchaser at a net price higher than that charged to any competing purchaser, where the discrimination may cause competitive harm as contemplated by the statutory language; and

4.    Order such other and further relief as the Court deems just and proper.

COMPLAINT

Dated: December 12, 2024

Respectfully submitted,

Of Counsel:

/s/ Christina J. Brown
CHRISTINA J. BROWN, Cal. Bar No. 242130
cbrown5@ftc.gov

HENRY LIU
Director

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Tel: (202) 326-2125

LAURA ALEXANDER
Deputy Director

Federal Trade Commission
Bureau of Competition

DANA F. ABRAHAMSEN
MICHAEL C. BAKER
DANIEL R. BLAUSER
DANIEL M. CHOZICK
JOSEPH M. CONRAD
STEPHANIE A. FUNK
JORDAN T. KLIMEK
MAIA T. PEREZ
ROSS E. STEINBERG
SHIRA A. STEINBERG
Attorneys

GEOFFREY M. GREEN
Assistant Director

PATRICIA M. McDERMOTT
Deputy Assistant Director

Bureau of Competition

JOHN D. JACOBS, Cal. Bar. No. 134154
Local Counsel
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
Tel: (310) 824-4300

*Attorneys for Plaintiff Federal Trade Commission*

COMPLAINT