CHRISTINA J. BROWN, Cal. Bar. No. 242130
cbrown5@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Tel: (202) 326-2125

JOHN D. JACOBS, Cal. Bar. No. 134154
Local Counsel
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
Tel: (310) 824-4300

*Attorneys for Plaintiff Federal Trade Commission*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> SOUTHERN GLAZER'S WINE AND SPIRITS, LLC, <br><br> Defendant. | **Case No.** 8:24-cv-02684-FWS-ADS <br><br> **COMPLAINT** <br><br> **REDACTED VERSION OF DOCUMENT FILED UNDER SEAL PURSUANT TO ORDER OF COURT DATED FEBRUARY 4, 2025** <br><br> **ACTION SEEKING NATIONWIDE RELIEF** |

COMPLAINT

## I.    NATURE OF THE CASE

1.    Defendant Southern Glazer's Wine and Spirits, LLC ("Southern") is the largest coast-to-coast distributor of wine and spirits in the United States. For years, Southern has violated the Robinson-Patman Act by selling wine and spirits to small, independent "mom and pop" businesses at prices that are drastically higher than the prices Southern charges large national and regional chains. Southern's discriminatory pricing practices have victimized independent and family-owned neighborhood grocery stores, local convenience stores, and other independent retailers across the country.

2.    Southern has been the largest U.S. wholesaler of wine and spirits every year for the past 28 years. In 2023, Southern's sales grew to approximately $26 billion, making it one of the ten largest privately held firms in the entire country. At present, Southern sells one out of every three bottles of wine and spirits purchased in the United States. In some states, Southern's share of wine and spirits sales is so large that Southern operates as the gatekeeper for the majority of wine and spirits sold in those states.

3.    As the single largest distributor of wine and spirits in the United States, Southern has harmed small businesses by charging them far higher prices than national or regional chains. For instance, Southern routinely charges small, independent retailers as much as 12% to 67% more for the same bottles of certain wine and spirits than national and regional chains in the exact same geographic area. These independent retailers include neighborhood grocery stores, local convenience stores, and independently owned wine and spirits shops.

4.    In fact, discriminatory pricing is deeply engrained in Southern's business strategy. In one instance, Southern employees discussed offering discounts that only a large national chain could access so as to "not have the erosion in [the] remainder of [the] market"—i.e., to ensure that smaller businesses would continue to pay higher prices to acquire the same products. In another

COMPLAINT

instance, Southern employees intentionally structured a multi-supplier deal for a different large national retailer so as "to protect the pricing" from being captured by "the rest of the market." In yet other instances, Southern offered large national chains secret special deals at favorable prices that it withheld from small independent businesses.

5.      These are not one-off instances of unlawful price discrimination. Instead, internal Southern documents confirm that price discrimination against small businesses is the norm: "Retailers in one channel may receive a discount that a retailer in another channel does not receive." Moreover, this price discrimination in favor of large national chains is not justified by differences in Southern's cost of distributing products to the different retailers, nor does it reflect bona fide attempts to meet prices offered to chain retailers by competing distributors.

6.      Southern's pricing practices are paradigmatic violations of the Robinson-Patman Act. Congress enacted the Robinson-Patman Act in 1936 to address a concern that large sellers were favoring newly arisen large corporate chains due to their greater purchasing power and granting them special prices, exclusive discounts, and secret rebates that the sellers withheld from smaller rivals. Congress feared that discriminatory prices on offer to only a small clique of "Goliath" chain corporations would undercut, impede, and eliminate competition from local, community-based businesses selling the same products. Ultimately, this process would leave just "a few economic overlords to whom everybody else owes economic allegiance."[1]

7.      As the Supreme Court explained in the seminal case *FTC v. Morton Salt Co.*, 334 U.S. 37, 43 (1948), "[t]he legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large

---

[1] *See* Remarks of Rep. Wright Patman introducing H.R. No. 8442, 79 Cong. Rec. 9077 (June 11, 1935); Remarks of Rep. Sumners, Debate in the House of Representatives on H.R. No. 21 8442, 80 Cong. Rec. 8109 (May 27, 1936).

COMPLAINT

buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price."

8.     Accordingly, Section 2(a) of the Robinson-Patman Act requires a level playing field, making it illegal for sellers to reduce competition by charging higher prices to disfavored customers that purchase commodities of like grade and quality, except where justified by differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which the commodities are sold or delivered to those purchasers, changed market conditions, or a good faith attempt to match a competing offer.

9.     Small, independent retail businesses are a critical component of the American economy and provide valuable alternatives to megastore chains—to the great benefit of consumers, communities, and competition. For many years, Southern has harmed, and it continues to harm, smaller grocery stores, convenience stores, and other independent retailers by charging them higher prices as compared to large national and regional chains.

10.     The Federal Trade Commission brings this action (i) to ensure that small, independent retailers served by Southern have access to the same discounts, rebates, and pricing as the large chains that they compete directly against, except to the extent justified by actual cost differences, changed conditions, or a good faith effort to meet a competitor's equally low price, and (ii) to obtain an injunction prohibiting further price discrimination by Southern against these small, independent businesses. When Southern's unlawful conduct is remedied, large corporate chains will face increased competition, which will safeguard continued choice for American consumers.

COMPLAINT

## II.    THE PARTIES

11.    Plaintiff Federal Trade Commission ("FTC") is an independent administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 et seq., and with its principal offices in Washington, D.C. The FTC is vested with authority and responsibility to enforce, inter alia, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 2 of the Clayton Act, 15 U.S.C. § 13, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate federal court proceedings to enjoin violations of any law the FTC enforces, including Section 2 of the Clayton Act, as amended by the Robinson-Patman Act. Since its enactment in 1936, the FTC has brought over 1,400 actions to enforce the Robinson-Patman Act.

12.    Defendant Southern Glazer's Wine and Spirits LLC is a Delaware corporation with its principal place of business located in Miami, Florida.

13.    Southern is the largest wholesale distributor of wine and spirits in the country. The company was formed in 2016 from the merger of Southern Wine & Spirits of America, Inc. and Glazer's, Inc. Each company had grown through a series of acquisitions of other distributors leading up to 2016, including Premier Wine & Spirits, World Class Wines, Olinger Distributing, The Odom Corporation, Star Distributors, Phoenix Wine & Spirits, Stoller Wholesale, Victor L. Robilio Co., Sterling Distributing, Alliance Beverage of Alabama, and Alliance Beverage of Mississippi. The merger of Southern Wine & Spirits and Glazer's gave the combined firm the largest service area of any U.S. wine and spirits distributor, with operations in 44 states and the District of Columbia. The company's announced acquisition of Horizon Beverage Group will expand its footprint into a total of 46 states.

14.    Southern distributes over 86,000 items and over 334,000 different stock keeping units ("SKUs"), including top selling spirits brands such as Patron Silver Tequila, Jim Beam Bourbon, Jameson Irish Whiskey, Aviation Gin, Bacardi

COMPLAINT

Rum, Grey Goose Vodka, Tito's Vodka, and Fireball Cinnamon Whiskey, and top-selling wine brands like Kim Crawford, Josh Cellars, Duckhorn, Stella Rosa, and La Marca.

15.     Southern controls a significant share of wine and spirits sales in numerous states. In Washington, for example, Southern estimated its share of statewide sales at ███% for spirits and ███% for wine. Southern estimated its share of statewide sales in Texas at ███% for spirits and ███% for wine, and in California at ███% for spirits and ███% for wine.

## III.     JURISDICTION AND VENUE

16.     This complaint is filed, and these proceedings are instituted under the provisions of Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

17.     This Court has subject matter jurisdiction over this action pursuant to Sections 5(a) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 53(b), 28 U.S.C. §§ 1331, 1337(a), and 1345.

18.     This Court has personal jurisdiction over Southern because Southern has the requisite constitutional contacts with the United States of America pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

19.     Southern's general business practices and the unfair methods of competition alleged herein are activities in or affecting "commerce" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44, and Sections 1 and 2 of the Clayton Act, 15 U.S.C. §§ 12-13.

20.     Southern is, and at all times relevant herein has been, a corporation, as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

21.     Venue in this district is proper under 15 U.S.C. § 22; Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); and 28 U.S.C. §§ 1391(b), (c) and (d). Southern is found, resides, transacts business, and/or has agents in California and in this

COMPLAINT

District, and a portion of the affected commerce described herein has been carried out in California and in this District. Southern has a significant presence throughout California, including in Southern California and this District. In 2022, Southern sold over 17,000 different items to more than 9,500 off-premise retail customers in Southern California, with sales totaling over $2.2 billion.

## IV.   ROBINSON-PATMAN ACT

22.   Subject to certain defenses, the Robinson-Patman Act, 15 U.S.C. § 13(a), makes it illegal for distributors and manufacturers to charge disfavored customers higher prices than those charged to favored customers for commodities of like grade and quality where the effect may be to lessen competition. This suspect conduct is known in antitrust law as "price discrimination."

23.   Each wine and spirit sold by Southern is a commodity within the meaning of Section 2(a) of the Robinson-Patman Act amendments of the Clayton Act, 15 U.S.C. § 13(a).

## V.   WINE AND SPIRITS INDUSTRY BACKGROUND

24.   Wine and spirits are generally sold in the U.S. through a non-integrated distribution system regulated by each state and requiring three distinct tiers. Producers in the first tier—including distillers, vintners, and importers (collectively, "suppliers")—may sell their wine and spirits only to distributors in the second tier. Distributors then re-sell the wine and spirits to retailers in the third tier, which then sell the products to consumers.

25.   State regulatory regimes for wine and spirits fall into three broad categories: open, franchise, and control. In open states, distributors buy wine and spirits from suppliers and re-sell to retailers. Distributors also provide marketing and promotional services to both suppliers and retailers. In franchise states, distributors provide similar services, but once a supplier selects a distributor, the relationship becomes a franchise as a matter of state law and can be terminated only for cause. In control states, by contrast, suppliers sell directly to the state, and

COMPLAINT

state-run agencies handle distribution and often retail sales; traditional distributors are limited to providing marketing services or serving as brokers for suppliers. This lawsuit concerns Southern's conduct in open and franchise states.

26.     In some or all of the open and franchise states in which Southern operates, Southern serves as the distributor for many of the largest wine and spirits suppliers, including Fifth Generation (Tito's Vodka), Constellation Brands (Svedka Vodka, Kim Crawford Sauvignon Blanc), Sazerac Co. (Buffalo Trace Bourbon, Fireball Cinnamon Whiskey), Pernod Ricard (Jameson Irish Whiskey, Absolut Vodka), Bacardi U.S.A. (Patron Silver Tequila, Grey Goose Vodka, Bacardi Rum), Diageo (Smirnoff Vodka, Aviation Gin), Suntory Global Spirits (Jim Beam Bourbon, Maker's Mark Whiskey), Deutsch Family Wine & Spirits (Josh Cellars), Delicato Family Wines (Noble Vines), E&J Gallo Winery (Clos du Bois, Barefoot), and Treasury Wine Estates (19 Crimes). Southern typically enters into exclusive distribution agreements with these suppliers that cover either a single state or multiple states. Southern represents numerous suppliers' brands in the same wine or spirits category in a state. For example, in Texas, Southern sells and distributes 1,019 different vodka products from 49 different suppliers. In Washington, Southern sells and distributes 1,053 different vodka products from 45 different suppliers.

27.     With limited exceptions, only retailers may sell to end consumers. Retailers include state licensed businesses selling wine and spirits to consumers either for on-premise consumption (e.g., bars or restaurants) or off-premise consumption (e.g., grocery stores, convenience stores, or other retailers). This lawsuit concerns Southern's sales to off-premise retailers. Southern generally classifies off-premise customers as either chain retailers (including both national and regional chain retailers) or independent retailers.

28.     Southern generally sells products to retailers pursuant to individual purchase orders rather than "master" (i.e., long-term) agreements governing price

COMPLAINT

or services. Apart from price and quantity, the terms of sale for independent and chain retailers are not materially different.

29.    Southern's sales to off-premise retailers totaled approximately $20 billion in 2022. Southern's largest off-premise chain customers include large wine and spirits retail chains like Total Wine, Binny's, Spec's, and BevMo, large grocery chains like Kroger and Albertsons, national club stores like Costco and Sam's Club, and national megastore chains like Walmart and Target. Stores operated by these large retail chains often draw customers from as far as 10 miles away; stores in rural areas draw customers from even greater distances.

30.    Southern's chain customers often purchase products from Southern through their own proprietary systems or third-party applications. These systems allow large chain retailers to view secret prices, promotions, and discounts, and place direct orders with Southern. Southern assigns dedicated teams of employees to support its key chain customers.

31.    Southern's independent off-premise customers differ in size. Some operate a single store and others a handful of locations. They include neighborhood grocery stores, local convenience stores, and local wine and spirits shops. Independent retailers typically purchase wine and spirits directly from Southern in one of three ways: placing orders directly with a Southern sales representative assigned to their store and other stores, placing orders through Southern's online platform called "Proof," or direct purchases picked up from a Southern warehouse. In some states, independent retailers also are permitted by state law to participate in purchasing cooperatives or "co-ops," which allow them to pool their purchases with other independent retailers. Even with the use of co-ops, however, independent retailers often do not receive the same favorable prices offered to large, favored retailers by Southern.

COMPLAINT

## VI.    SOUTHERN'S UNLAWFUL PRICE DISCRIMINATION

32.    Beginning at least as early as 2018 and continuing through the present, Southern has repeatedly discriminated in price between disfavored independent purchasers and favored large chain purchasers of wine and spirits located in both rural and urban areas throughout open and franchise states, including but not limited to areas such as Concord, Lakeside, Newport Beach, San Diego, Santee, Tarzana, and Venice Beach in California; Flagstaff, Page, Prescott, Safford, and Tucson in Arizona; Charleston, Chicago, Collinsville, Murphysboro, O'Fallon, and Peoria in Illinois; Austin, College Station, El Paso, and San Antonio in Texas; and Gig Harbor, Omak, Redmond, and Tacoma in Washington. In reasonably contemporaneous transactions, Southern charged significantly higher prices for identical bottles of wine and spirits to disfavored independent retailers than to favored large chain retailers that are in proximity to and in active competition with the disfavored retailers for the resale of wine and spirits to the same pool of end consumers. The favored large chain store and the disfavored independently owned store are often located within just a few blocks to a few miles of each other. These purchases often occurred within the same week or month, and sometimes even occurred on the same day. Favored chain retailers know they receive discriminatory prices because of Southern's tiered pricing schedules and their engagement in special solicitations and negotiations with Southern.

33.    These disparities in pricing are not justified by differences in Southern's cost of providing goods to the large chain retailers and the independent retailers—whether in terms of economies of scale or the logistics of delivering the goods to different sized stores. Nor are these pricing differences supported by a need for Southern to match prices being offered to chain customers by competing distributors.

34.    In short, Southern has engaged in a sustained course of discriminatory pricing in violation of the Robinson-Patman Act. For example, Southern's sales

COMPLAINT

invoice data shows that in 2022, independent retailers located in Arizona, California, Illinois, Texas, and Washington paid materially higher prices than nearby chain retailers for the exact same products in the vast majority of transactions.

### A.    Southern's Mechanisms of Price Discrimination

35.    Southern's discriminatory prices to favored chain customers are effectuated through a variety of mechanisms. Those mechanisms include large, high-volume quantity discounts, cumulative quantity discounts, channel pricing, scan rebates, special or "hard coded" pricing, retroactive price reductions on inventory already held by favored large chain customers, and delayed implementation of price increases for certain favored customers.

36.    In some instances, Southern solicits and accepts money or "discount support" funding from suppliers in return for providing discriminatory pricing that is accessible only to favored large chain retailers. This money or funding is not associated with any efficiency derived from the differing methods or quantities in which the wine or spirits are manufactured, sold, or delivered to the favored large chains.

37.    The cumulative consequence of Southern's strategies is that Southern routinely charges higher prices to smaller independent businesses as compared to megastore chains and other large national and regional retailers.

### 1.    Large Quantity Discounts

38.    Southern often sets the deepest available discounts at quantity purchase levels that only a few specific large chain customers can attain and that are not justified by cost savings achieved by Southern.

39.    Some quantity discounts offered by Southern require purchases of ███ to ███ cases at a time. In some instances, Southern referred to the largest quantity levels associated with these deals as retailer-specific "lanes" ██████ ████████████████████████████████████████. In addition,

COMPLAINT

Southern's deal identification database includes many deals that are explicitly named and created for particular large chain retailers.

40.    In numerous instances, Southern gave favored large chain retailers preferential treatment on pricing associated with a specific quantity discount level even on purchases that did not achieve the nominally required volume, indicating that these discounts are not driven by economies of scale.

41.    Southern's large, high-volume quantity discounts forced disfavored independent retailers to pay significantly higher prices than favored large chain retailers purchasing the same products and created significant retail pricing and margin advantages for large chain retailers in the resale of those products to end consumers.

### 2.    Large Cumulative Quantity Discounts

42.    Southern often allows favored large chain retailers to combine purchases over a specified period to qualify for cumulative quantity discounts. In numerous instances, these cumulative quantity discounts were offered only to large chain retailers and, even when independent retailers were offered cumulative quantity discounts for the same product, the discounts offered to chains were higher for no justifiable reason. Large chain retailers were able to qualify for these cumulative volume thresholds by combining purchases across many stores or by utilizing warehouses. In contrast, small independent retailers often operate only a single store or handful of locations and generally have limited storage space.

43.    These cumulative quantity discounts often were substantial and significantly increased the discriminatory pricing between large chain stores and small independent businesses. Southern typically provides cumulative quantity discounts by issuing post-delivery, off-invoice credits to the retailer.

44.    For example, in California in 2022, Southern awarded favored retailers ██████, ████, and ██████ credits totaling more than $████, $██████, and $██████ associated with cumulative quantity discounts for

COMPLAINT

their respective purchases of wine and spirits. In contrast, during the same period, Southern awarded all independent retailers in California less than $████ in credits associated with cumulative quantity discounts.

45.   To provide one stark example, for purchases of ████████ ████████████ in 2022, Southern did not award any cumulative quantity discounts to independent retailers in California. During the same period, Southern awarded favored large chain retailers in California cumulative quantity discounts valued at $███ to $████████. In 2022, ██████ alone received cumulative quantity discounts totaling approximately $████ in connection with its purchases of ████████████.

### 3.   Scan Rebates

46.   A scan rebate is a price reduction given to a retailer's customer at the register for each bottle of a certain brand or product purchased (e.g., $2 off per bottle of Tito's Vodka). The retailer is reimbursed dollar-for-dollar by the supplier or Southern for each scan discount extended to customers.

47.   When scan rebates are funded by suppliers, Southern is directly involved in offering and facilitating the provision of scan rebates to favored large chain retailers. In some instances, Southern also funds scan rebates directly for favored chain retailers.

48.   In one instance in California in 2019, the scan rebate for retail sales of ████████████ was so large that the favored chain retailer was able to promote the product at a retail price of $████████, while the best *wholesale* price available to the disfavored independent retailer was $████████. In other words, a large chain was able to sell the product to customers at a price at which independent retailers could not even buy the product from Southern.

49.   Southern often awards favored large chain retailers scan rebates that are not made available to competing disfavored independent retailers. For example, in Arizona, ████ and ██████ accumulated at least $████ and $██████ in

COMPLAINT

scan rebates, respectively, largely from January through August 2023. In Illinois, ███████████████████████████████████████, received over $██████ in scan rebates just for its sales of ███████████████ products in 2020. In contrast to these large chain retailers, independent retailers generally do not receive scan rebates.

**4.    Channel and Special Pricing for Favored Chain Retailers**

50.    In several states, Southern "profiles" a chain to receive a certain pricing level in a practice frequently called "channel pricing" or "directed pricing." For example, in California, a favored chain retailer may be profiled as a ██████ ███████████████████████████████████████ chains are automatically profiled at the ██████ discount level for spirits and the ████████ discount level for wine, while ██████████ chains are profiled at the ████████ discount level for spirits, and the █████████ discount level for wine. When a favored chain retailer is profiled into one of these categories, it receives the price associated with its profile, regardless of how many cases of a given product it purchases.

51.    Internal Southern documents confirm that this practice results in price discrimination among retailers: "Retailers in one channel may receive a discount that a retailer in another channel does not receive." Apparently recognizing that customers would be upset when they learned that they were not offered the same deals, Southern informed its employees that "[p]ricing for other channels is a proprietary trade secret."

52.    In addition to channel pricing, Southern creates special deals with preferential pricing that are only available to particular favored chain retailers. For example, in August 2020, Southern created a special pricing deal of $████████ ██████ for ██████████████████ purchases by ██████████ in California with no quantity requirements. The single case price available to competing retailers at the time was $█████. Even the quantity discounts for ██████████ purchases ($██████) to ██████████

COMPLAINT

13

purchases ($░░░░░) available to other retailers resulted in higher prices than ░░░░░░ special deal price.

53.    By way of further example, in June 2023, Southern created a multi-supplier deal specifically for the ░░░░░░ store located in ░░░░░░░░. Southern deliberately structured the deal in a manner that prevented other customers in the market from "capturing" the special pricing and offered the deal for just ░░░░░░. ░░░░░░░ purchased a total of ░░ cases of wine and spirits pursuant to this deal, including ░░░░░░░░░ for $░ per case and ░░░░░░ ░░░ for $░ per case. No other retailer purchased products from Southern via this deal or at this pricing level.

### 5.    Delayed Price Increases for Favored Retailers

54.    At times, Southern delays price increases or honors expired pricing for favored large chain retailers, while disfavored independent retailers are charged the higher price. For example, in March 2023, Southern delayed a price increase on ░░░░░░░░░░░░░░░░░░░░░ in ░░░░░░ until after ░░░░░, despite the price increase going into effect for the broader market on ░░░░. In another instance, in January 2023, Southern alerted its employees that most items within a supplier's product portfolio would increase in price on ░░░░░░░░░, but that chain pricing would remain the same until ░░░.

### B.    Exemplar Instances of Southern's Price Discrimination

55.    Southern's substantial and sustained price discrimination can be seen through a sampling of specific product examples.

### 1.    ░░░░░░░░░░░ (California and Arizona)

56.    From 2018 to present, Southern has consistently sold ░░░░░░░ of the popular brand ░░░░░░░░░ to disfavored independent retailers in California and Arizona at prices significantly higher than the prices charged to favored chain retailers. In 2022, Southern provided cumulative quantity discounts to ░░░░░░ in California that resulted in ░░░░░░ paying effective net prices

COMPLAINT

of approximately $▇▇▇ per bottle. At the same time, Southern charged disfavored independent grocers, convenience stores, and other retailers that purchased full cases and competed with nearby ▇▇▇▇▇ locations in California net prices of up to $▇▇▇ to $▇▇▇ per bottle, or as much as $▇▇▇ (▇%) to $▇▇▇ (▇%) more per bottle than ▇▇▇▇▇. Indeed, $▇▇▇ per bottle was the price most commonly paid by independent retailers in California in 2022, and over ▇% of independent retailers paid at or above this price. Southern acquired ▇▇▇ bottles of ▇▇▇ ▇▇▇▇▇ from ▇▇▇▇▇▇▇▇ specifically to fulfill ▇▇▇▇ purchase orders in California, and not for holding in general inventory.

57.     In Arizona, Southern provided ▇▇▇ a quantity discount deal supposedly tied to a ▇▇-case (or ▇▇▇ bottle) purchase requirement that resulted in an on-invoice net price of approximately $▇▇▇ per ▇▇▇▇ bottle for ▇▇▇ ▇▇▇▇▇▇ from September 2018 through at least October 2023. Southern also extended the $▇▇▇ price to ▇▇▇ for purchases of ▇ cases (▇ bottles) to as little as ▇ cases (▇ bottles) at a time. Similarly, in 2021 and 2023, Southern provided ▇▇▇▇▇ the same effective net price of $▇▇▇ per bottle tied to a ▇▇-case (or ▇▇▇ bottle) purchase requirement for the same product. Southern likewise extended the $▇▇▇ price to ▇▇▇▇▇ purchase of just ▇ cases (▇ bottles) at a time. Southern acquired ▇▇▇ bottles of ▇▇▇▇▇▇ from ▇▇▇▇▇▇▇ specifically to fulfill ▇▇▇▇ and ▇▇▇▇ respective purchase orders and anticipated purchase orders in Arizona, and not for holding in general inventory.

58.     In contrast, from September 2018 to at least October 2023, Southern generally charged competing disfavored independent retailers that purchased full cases in Arizona approximately $▇▇▇ to $▇▇▇ for ▇▇▇ bottles of ▇▇▇▇▇▇, even when purchasing up to ▇ cases (▇ bottles) at a time. Southern thus charged disfavored independent retailers as much as $▇▇▇ (▇%) to $▇▇▇ (▇%) per bottle more than these favored chain retailers for the identical product in

COMPLAINT

Arizona over a five-year period. The price most commonly paid by independent retailers in Arizona in this period was $████ per bottle—$████ (██%) more per bottle than favored chain retailers—and more than ██% of independent retailers paid at or above this price.

         **2.**     █████████████████████ **(Illinois and California)**

       59.   ████████████████████ is the most popular ███████████ product in the United States. Southern has consistently sold ████ bottles of this wine to disfavored independent retailers in Illinois and California at significantly higher net prices than those paid by favored chain retailers. For instance, in Illinois in 2022, Southern charged ████ a net price of $██ per bottle while Southern typically charged competing disfavored independent grocers, corner stores, and other retailers net prices of $███ to $███ per bottle, or up to a █% higher price than ████ for purchases of full cases. $███ per bottle was the price most commonly paid by independent retailers in Illinois in 2022, and over █% of independent retailers paid this price. This price differential was attributable to ████ lower on-invoice pricing together with cumulative quantity discounts taking the form of off-invoice credits. Southern acquired ████ bottles of ███ ████████████ from out-of-state supplier ██████████████ to meet ████ anticipated needs and ordering history in Illinois, and not for holding in general inventory.

      60.    Similarly, in California in spring 2022, Southern charged ███████ a net price of $███ per bottle (not including any applicable scan discounts), while Southern charged competing disfavored independent retailers net prices of as much as $███ to $███ per bottle, or up to a █% higher price than ████████ for purchases of full cases. The price most commonly paid by independent retailers in California in 2022 was $███ per bottle—up to $███ (██%) more per bottle than favored chain retailers—and over █% of independent retailers paid at or above this price. Southern acquired ████ bottles of ████████████████

COMPLAINT

1  from █████████████████████████ to meet ███████ anticipated

2  needs and ordering history in California, and not for holding in general inventory.

3  **3.** ███████████████ **(Illinois and California)**

4  61.    From 2018 to present, Southern has consistently sold ███████████

5  █████, a ████████████████████, to disfavored independent retailers in Illinois

6  and California at significantly higher net prices than paid by favored chain

7  retailers. For instance, in 2022, ██████ paid on-invoice net prices of

8  approximately $██ to $████ per ████ bottle for ████████████████. During

9  this same period, Southern charged disfavored independent grocers, convenience

10  stores, and other retailers with locations near ██████ stores in Illinois on-invoice

11  net prices of as much as $████ to $████ per bottle for the identical product, or

12  $████ (██%) to $█████ (██%) more than ████████ for purchases of full cases. The

13  price most commonly paid by independent retailers in Illinois in 2022 was $████

14  per bottle—$████ (██%) more per bottle than favored chain retailers—and over

15  ██% of independent retailers paid at or above this price. Southern acquired █████

16  bottles of █████████████████ from out-of-state supplier ███████████████████

17  to meet ███████ anticipated needs and ordering history in Illinois, and not for

18  holding in general inventory.

19  62.    Notably, these on-invoice net prices do not account for additional off-

20  invoice credits, discounts, and scan rebates that Southern provided to ███████, but

21  not to independent retailers, during this period. These off-invoice benefits further

22  exacerbated Southern's discriminatory pricing favoring ████████ over independent

23  retailers for purchases of █████████████████.

24  63.    Similarly, in California during 2022, Southern charged ████████ a net

25  invoice price of at most $██████ per ████ bottle of ████████████████. When

26  off-invoice credits for cumulative quantity discounts up to about $█████ per bottle

27  are included, ███████ paid as little as $██████ per bottle. In contrast, Southern

28  charged independent retailers in proximity to ██████ stores in California as much

COMPLAINT

as $███ per bottle, or an $███ ██%) higher price than what was charged to
████ for purchases of full cases. The price most commonly paid by independent
retailers in California in 2022 was $████ per bottle—$███ (██%) more per bottle
than favored chain retailers—and nearly █% of independent retailers paid at or
above this price. Southern acquired ████ bottles of ████████████ from
████████████████████ specifically to fulfill ██████
anticipated purchase orders in California, and not for holding in general inventory.

### 4.    Other ████ Spirits (California)

64.    Southern's analyses show that, in California in 2022, Southern
charged independent retailers a significantly higher average net price per case than
favored chain retailers for ████ bottles of numerous other ████ spirits.

| Item | Chain Price | Independent Price | Premium Paid by Independents | Percent Difference |
|---|---|---|---|---|
| ████████ | ███ | ████ | ████ | ███ |
| ████████ | ███ | ████ | ████ | ███ |
| ████████ | ███ | ████ | ████ | ███ |
| ████████ | ███ | ████ | ████ | ███ |

The average net prices reported by Southern are calculated by dividing net sales by
cases sold for all off-premise transactions within California in 2022. These average
prices do not account for scan rebates.

65.    The foregoing examples illustrate a broader pattern of Southern
charging higher prices to disfavored independent retailers as compared to
competing favored chain retailers for the same product, in the same geographic
area, at the same time.

### C.    Lack of Functional Availability and Lack of Justification

66.    Many discounts and deals offered by Southern to favored chain
retailers are not functionally available to disfavored independent retailers. Such
discounts are not offered to independent retailers on a systematic basis. For
example, Southern discussed creating a quantity discount for one chain retailer at a

COMPLAINT

high enough quantity level to "not have the erosion in the remainder of [the] market." Another Southern document states directly: "Retailers in one channel may receive a discount that a retailer in another channel does not receive."

67.    Disfavored independent retailers frequently are not informed about the large quantity discounts, cumulative quantity discounts, special deals, and scan rebates available to favored chain retailers, even when it may be logistically feasible for the independent retailer to participate in the deal.

68.    The largest quantity deals often are not displayed on Proof, the online purchasing platform that Southern encourages independent retailers to use. Southern executives acknowledge that large quantity discount deals and cumulative quantity discount deals are unlikely to be communicated to disfavored independent retailers by their assigned Southern sales representatives because it is generally known that many such customers cannot meet the required purchase volumes due to their smaller scale, limited storage space, or inability to make large cash-on-demand payments upfront for wine and spirits purchases.

69.    In other instances, favored chain retailers are advised months in advance of a particular deal that, for all other customers, is only active for a very short window, as little as a week or even a single day, rendering it unlikely a disfavored independent retailer would become aware of the deal through Proof or via direct communications with a sales representative.

70.    Even when a discriminatory deal or discount program is made known to all competing retailers by Southern, these discounts often are not functionally available to disfavored small, independent retailers. Generally, independent retailers cannot buy the volume necessary to achieve the highest discounts due to their smaller storage space, lack of funds needed to purchase such quantities, and lower turnover of products. In other instances, disfavored independent retailers expressed interest in buying at the higher-volume quantity discount levels to secure the deeper discounts, but Southern declined to make those deal levels available to

COMPLAINT

the independent retailers.

71.    The discriminatorily higher prices Southern charged disfavored independent retailers were not justified by cost savings Southern accrued doing business with the favored chain retailers. That is, the pricing differentials between favored and disfavored retailers exceed any cost savings achieved by Southern when selling and delivering wine and spirits to the favored national chains.

72.    Nor were the discriminatory pricing and benefits Southern provided to favored chain retailers a good faith attempt to meet, but not exceed, the equally low price of a competing distributor of wine and spirits.

73.    Similarly, Southern's discriminatory pricing provided to favored large chain retailers does not reflect a response to changing conditions affecting the market for or the marketability of the wine or spirits concerned.

## VII.  HARM TO COMPETITION

74.    In each instance of price discrimination alleged herein, the disfavored independent retailer(s) competed with the favored large chain retailer(s) in the same geographic area(s) for sales of identical bottles of wine and spirits to the same pool of end consumers. Indeed, Southern's own executives have confirmed that large chain retailers compete directly with small, independent businesses in the same geographic areas.

75.    Southern's acts of price discrimination involved substantial price differences between competing retailers (i.e., a favored chain retailer and a nearby disfavored independent retailer) in millions of transactions over multiple months and years. In certain transactions, disfavored independent retailers paid as much as 32% to 78% more than competing favored retailers. Southern has made repeated discriminatory sales of wine and spirits to disfavored and favored retailers across many states from at least January 2018 through the present.

76.    In many instances, the price discrimination was so significant that the favored chain stores were able profitably to re-sell Southern products at retail

COMPLAINT

prices below the wholesale prices paid by disfavored independent retailers to procure from Southern the exact same bottle of wine or spirits.

77.     The effect of Southern's price discrimination has been or may be substantially to lessen and impede competition in the retail sale of wine and spirits, or to injure, destroy, or prevent competition between such favored and disfavored retailers in the same geographic areas that sell the same products to the same pool of end consumers.

78.     Disfavored independent retailers have been damaged by Southern's price discrimination. As a result of Southern's unlawful practices, independent retailers have lost sales and customers to favored large chain retailers, have been unable to be price-competitive with favored large chain retailers so as to attract customers, have sold lower volumes of wine and spirits than they would have sold in the absence of price discrimination, and have made lower profits on the products they did sell.

## VIII.  IN COMMERCE

79.     In each instance of price discrimination alleged herein, Southern has engaged and is now engaging in commerce, as defined in the Clayton Act, as it sells, distributes, ships, or causes to be shipped wine and spirits produced overseas or in one state of the United States to customers located in other states and in the District of Columbia.

80.     Southern purchases wine and spirits from out-of-state or overseas producers, and then re-sells the wine and spirits to retailers in other states, without any transformation of the products, in a continuing flow of interstate commerce across state boundaries. The wine and spirits products are, and were, sold for resale and consumption within the United States.

81.     In many instances, Southern places orders from suppliers through regional divisions that cover multiple states. These regional divisions work with national and state divisions to determine the products and quantities that Southern

COMPLAINT

purchases from suppliers. National divisions also work with suppliers to develop product plans and distribution goals, and to coordinate multi-state sales and promotional opportunities that are executed by state teams.

82.     In most instances, Southern obtains ownership over the products that it distributes as soon as the products leave the supplier's warehouse, and Southern is responsible for coordinating the shipment of the products across state lines to Southern's warehouses throughout the United States, from which the products are sold to Southern's retail customers.

83.     The demand for wine and spirits from Southern's customers (including its large chain customers) is reasonably constant and predictable. Southern orders products from suppliers for immediate or future delivery to retail customers based in part on specific retail customers' pending purchase orders, commitments to place future orders, and anticipated purchases pursuant to upcoming deals and promotions.

84.     Based on the foregoing circumstances, the wine and spirits purchased and sold by Southern remain in the flow of interstate commerce so as to be considered "in commerce" for purposes of the Robinson-Patman Act because:

        a.      Southern purchases wine and spirits from suppliers to fulfill existing orders from specific large chain retailers, including Costco, Total Wine, Walmart, Target, Kroger, Albertsons, and Binny's, with the intent that the purchased goods are to go to that specific retailer;

        b.      Southern purchases wine and spirits from suppliers to meet the purchase commitments made by specific large chain retailers, including Costco, Total Wine, Walmart, Target, Kroger, Albertsons, and Binny's, pursuant to Southern's understanding with those retailers, whether for immediate delivery or not; and/or

        c.      Southern purchases wine and spirits from suppliers to meet the anticipated needs of its specific large chain retailer customers, including Costco,

COMPLAINT

Total Wine, Walmart, Target, Kroger, Albertsons, and Binny's.

## COUNT ONE

### (Robinson-Patman Act, 15 U.S.C. § 13(a))

85.    Each of the allegations in paragraphs 1 through 84 are incorporated in this Count One as if fully set forth herein.

86.    The acts and practices of Southern set forth in paragraphs 1 through 84 above constitute unlawful price discrimination in violation of Section 2(a) of the Robinson-Patman Act amendments to the Clayton Act, 15 U.S.C. § 13(a), and will continue in the absence of the relief herein requested.

## COUNT TWO

### (Section 5 of Federal Trade Commission Act, 15 U.S.C. § 45)

87.    Each of the allegations in paragraphs 1 through 84 are incorporated in this Count Two as if fully set forth herein.

88.    The acts and practices of Southern set forth in paragraphs 1 through 84 above constitute unfair methods of competition in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and will continue in the absence of the relief herein requested.

## PRAYER FOR RELIEF

WHEREFORE, the FTC respectfully requests that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and as authorized by its own equitable powers:

1.    Enter final judgment against Defendant Southern Glazer's Wine and Spirits LLC;

2.    Grant the FTC preliminary and permanent injunctive relief;

3.    Order Southern to cease and desist from price-discriminating, within the meaning of Section 2(a) of the Robinson-Patman Act, by selling its products to any purchaser at a net price higher than that charged to any competing purchaser, where the discrimination may cause competitive harm as contemplated by the statutory language; and

4.    Order such other and further relief as the Court deems just and proper.

COMPLAINT

Dated: December 12, 2024

Of Counsel:

HENRY LIU
Director

LAURA ALEXANDER
Deputy Director

Federal Trade Commission
Bureau of Competition

Respectfully submitted,

/s/ Christina J. Brown
CHRISTINA J. BROWN, Cal. Bar No. 242130
cbrown5@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Tel: (202) 326-2125

DANA F. ABRAHAMSEN
MICHAEL C. BAKER
DANIEL R. BLAUSER
DANIEL M. CHOZICK
JOSEPH M. CONRAD
STEPHANIE A. FUNK
JORDAN T. KLIMEK
MAIA T. PEREZ
ROSS E. STEINBERG
SHIRA A. STEINBERG
Attorneys

GEOFFREY M. GREEN
Assistant Director

PATRICIA M. McDERMOTT
Deputy Assistant Director

Bureau of Competition

JOHN D. JACOBS, Cal. Bar. No. 134154
Local Counsel
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Blvd., Ste. 400
Los Angeles, CA 90024
Tel: (310) 824-4300

*Attorneys for Plaintiff Federal Trade Commission*

COMPLAINT