**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHERN GLAZER'S WINE AND SPIRITS, LLC,<br><br>Defendant. | Case No. 8:24-cv-02684-FWS-ADS<br><br>Judge: Fred W. Slaughter<br><br>**[PROPOSED] STIPULATED CONSENT DECREE AND ORDER** |

Plaintiff, the Federal Trade Commission ("Commission"), filed its Complaint ("Complaint") in this matter pursuant to Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, and Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. The Commission and Defendant Southern Glazer's Wine and Spirits, LLC ("Defendant") (together, the "Parties"), by their respective attorneys, have reached an agreement to resolve this case through settlement, and without trial or final adjudication of any issue of fact or law, and stipulate to entry of this Stipulated Consent Decree and Order ("Order").

**THEREFORE, IT IS ORDERED** as follows:

## FINDINGS

A. The Court has jurisdiction over the Parties and subject matter of this action. Venue is proper in this Court under 15 U.S.C. § 22; Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); and 28 U.S.C. §§ 1391(b), (c), and (d). Defendant is found, resides, transacts business, and/or has agents in California and in this District, and a portion of the affected commerce described herein has been carried out in California and in this District. Defendant has a significant presence throughout California, including Southern California and this District.

B. The Complaint alleges that Defendant violated Section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13, and Section 5 of the FTC Act, 15 U.S.C. § 45, by selling wine and spirits to disfavored independent retailers at higher prices than it charges large, favored chain retailers. Defendant's general business practices and conduct alleged in the Complaint are activities in or affecting "commerce" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44, and Sections 1 and 2 of the Clayton Act, 15 U.S.C. §§ 12-13. Defendant denies the allegations in the Complaint.

C. Defendant is, and at all times relevant herein has been, a corporation, as defined in Section 4 of the FTC Act, 15 U.S.C. §44.

D. This Order does not constitute any evidence against Defendant, or an admission of liability or wrongdoing by Defendant. This Order shall not be used in any way, as evidence or otherwise, in any other litigation or proceeding; *provided that,* nothing in this provision prevents the Parties from using this Order in any proceeding to enforce or modify this Order or as otherwise required by law. For the avoidance of doubt, no Cure Payment, Compliance Report, or notice, report, or determination of the Monitor shall constitute an admission by Defendant that a violation of this Order or the Robinson-Patman Act has occurred, but may constitute evidence of such a violation in a proceeding to enforce or modify this Order.

E. Entry of this Order is in the public interest.

## **STIPULATIONS**

A. The Parties, by and through their counsel, have agreed that entry of this Order fully and finally resolves all issues between them arising from the specific events underlying the Complaint and precludes further litigation between the Parties on the resolved issues except for the purposes of enforcing or modifying this Order.

B. Solely for purposes of this Order, Defendant admits the facts necessary to establish personal and subject matter jurisdiction of this Court.

C. Defendant stipulates that it shall comply with the provisions of this Order pending its entry by the Court.

D. Defendant shall bear its own costs of this action, including attorney's fees and the Monitor costs set forth in Section VIII of this Order, and shall not make any claims against the Commission for attorney's fees or costs.

E. Defendant waives all rights to appeal or otherwise challenge or contest the validity of this Order.

F. Defendant waives any claim under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear its own costs and attorney's fees in this litigation.

G. The Parties stipulate that certain appendices shall be filed under seal, as set forth in the accompanying Joint Motion to Seal.

## DEFINITIONS

**IT IS ORDERED** that, as used in this Order, the following definitions shall apply:

A. "Commission" means the United States Federal Trade Commission.

B. "Defendant" means Southern Glazer's Wine and Spirits, LLC, and any joint venture, subsidiary, division, group, or affiliate currently or subsequently controlled by Southern Glazer's Wine and Spirits, LLC, together with their successors and assigns, and the respective directors, officers, employees, agents, representatives acting on behalf of each.

C. "Covered Retailer" means any Off-Premise Retailer that: (1) is not an In-Commerce Retailer; (2) has 75 or fewer retail store locations in the United States under (i) common ownership, (ii) common operation, or (iii) the same trade name; and (3) does not engage in Sub-Distribution to other retailers, other than in South Carolina and Texas. In all states other than South Carolina and Texas, transactions involving a Covered Retailer engaged in Sub-Distribution may not be included in Paired Transactions notwithstanding any change in law.

D. "Discriminatory Paired Transaction" means a Paired Transaction in which the Net Price Differential exceeds the sum of the Safe Harbor plus any Supplier Support Differential.

E. "Enforcement Threshold" means $5,000 in aggregated Excess Payments from all Discriminatory Paired Transactions involving a particular Covered Retailer within any 12-month reporting period. A 12-month reporting period shall be the twelve (12) months in any two consecutive semi-annual Compliance Reports to be filed on February 15 and August 15. Paired Transactions may only be counted during one reporting period.

F. "Excess Payment" means, for a Discriminatory Paired Transaction, the Net Price Differential multiplied by the number of cases purchased by the Covered Retailer. Only the difference between the Net Price paid by the In-Commerce Retailer and by the Covered Retailer after accounting for the sum of the Safe Harbor plus any Supplier Support Differential multiplied by the number of cases purchased by the Covered Retailer shall count as an Excess Payment for purposes of calculating the $5,000 Enforcement Threshold.

G. "Executive and Commercial Staff" means (1) the President and Chief Executive Officer, Chief Financial Officer, Chief Legal and Compliance Officer, Vice Presidents of National Accounts, Vice Presidents of Commercial Finance, Vice Presidents of Commercial Operations, or Vice Presidents of Sales;

(2) Defendant's employees who report directly to the individuals identified in the foregoing clause (1) of this definition and who have access to Defendant's pricing and revenue management systems for any Product; and (3) any of Defendant's employees who have substantial responsibility for revenue management or for setting pricing. For the avoidance of doubt, sales representatives do not qualify as "Executive and Commercial Staff."

H. "Geographic Proximity" means that a Covered Retailer store and an In-Commerce Retailer store are located within the same state and within the following distances of one another:

1. 1.5 miles in Chicago, New York City, San Francisco, and Seattle;
2. 2.5 miles in all other urban areas in a Relevant State;
3. 6 miles in suburban areas in a Relevant State; and
4. 12 miles in rural areas in a Relevant State.

Urban, suburban, and rural designations shall be based on the zip code of the Covered Retailer and shall be defined according to the most current National Center for Education Statistics Education Demographic and Geographic Estimates (NCES EDGE) Data. The NCES data classify locale into four

categories: city, suburban, town, and rural. Each zip code shall be assigned a category based on the location of its centroid relative to the locale boundary, and the town and rural categories shall be combined into a single "rural" category.

I. "In-Commerce Retailer" means an Off-Premise Retailer that, with respect to any sale of Products by Defendant to it in a Relevant State, ranked among Defendant's top 5 Off-Premise Retailer customers by total dollar sales of Products in that Relevant State during the calendar year immediately preceding the calendar year of that sale, and includes that Off-Premise Retailer's retail stores in that Relevant State. For purposes of this Order and any action to enforce this Order, all sales of Products from Defendant to an In-Commerce Retailer, except sales of Products manufactured in the same state as the In-Commerce Retailer's store location, are deemed to be "in commerce" under the Robinson-Patman Act, and Defendant shall not argue otherwise. Defendant reserves the right to make such argument in litigation other than an action to enforce this Order.

J. "Monitor" means an individual with no current or former affiliation with Defendant, appointed pursuant to the terms of Section VIII of this Order.

K. "Net Price" means the final per case amount an Off-Premise Retailer pays Defendant for a Product after applying all discounts, rebates, credits, billbacks, offsets, allowances, incentive payments, and all other price adjustments or consideration affecting the amount paid, whether or not reflected on the invoice.

1. The calculation of Net Price shall net out any scan rebate or instant redeemable coupon funded by Defendant;
2. For cumulative quantity discounts, the total dollar rebate shall be allocated equally across all qualifying cases purchased during the applicable deal period; and
3. For buy-one-get-one and mix-and-match promotions, prices shall be reasonably allocated across all cases purchased under the promotion.

L. "Net Price Differential" means the difference between the Net Price paid to Defendant by the In-Commerce Retailer and the Net Price paid to Defendant by the Covered Retailer.

M. "Off-Premise Retailer" means a retailer that sells Products for off-premise consumption (*i.e.*, consumption offsite of that retailer), excluding hotels, caterers, gas stations, wedding chapels, golf courses, and any store for which off-premise Product sales are not a material line of business (*i.e.*, Bed Bath & Beyond). Off-premise Product sales are deemed a material line of business for every In-Commerce Retailer.

N. "Operating Expense Efficiency" means either:

1. The state-specific per case operating expense differential between Defendant's sales to chain retailers and Defendant's sales to independent retailers set out in Non-Public Appendix A, adjusted annually by the non-seasonally adjusted Consumer Price Index for All Urban Consumers (CPI-U) for years after 2026; or
2. At Defendant's election, a revised state-level operating expense efficiencies calculation that has been vetted and approved by the Monitor, in consultation with the parties.

O. "Paired Transaction" means two distinct transactions occurring within Temporal Proximity: (1) the first transaction is the sale by Defendant of a Product to an In-Commerce Retailer; (2) the second transaction is the sale by Defendant of a Product of like grade and quality to a Covered Retailer located within Geographic Proximity to the In-Commerce Retailer. For purposes of identifying a Paired Transaction:

i. Where the In-Commerce Retailer has one warehouse in the Relevant State, Defendant's terms of sale to the warehouse (including Net Price and invoice date) shall be considered Defendant's terms of sale to each of the In-Commerce Retailer's retail store locations in the Relevant State;

ii. Where the In-Commerce Retailer has more than one warehouse in the Relevant State, for each of the In-Commerce Retailer's retail store locations, Defendant's terms of sale (including Net Price and invoice date) shall be Defendant's terms of sale to the nearest warehouse located in the same state;

iii. Where a store location is equidistant between two warehouses operated by an In-Commerce Retailer, or when the applicable warehouse is otherwise ambiguous, Defendant shall work with the Monitor or Commission staff to designate the appropriate warehouse; and

iv. Transactions involving a Product manufactured in the same state as the location of the In-Commerce Retailer's store are excluded from Paired Transactions.

P. "Product" means any wine or spirit sold by Defendant.

Q. "Relevant States" means Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Hawaii, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Minnesota, Missouri, Nebraska, Nevada, New Mexico, New York, North Dakota, Oklahoma, South Carolina, Tennessee, Texas, and Washington.

R. "Safe Harbor" means Defendant's Operating Expense Efficiency for the applicable Relevant State and year of the Paired Transaction plus 2.5% of the In-Commerce Retailer's Net Price in that Paired Transaction.

S. "Sub-Distribution" means that an Off-Premise Retailer has as a lawful, current, and material line of business selling Products to other retailers for on- or off-premise consumption. For purposes of this Order, In-Commerce Retailers are deemed not to be engaged in Sub-Distribution.

T. "Supplier Support" means moneys paid or credited to Defendant by a Product supplier that under Generally Accepted Accounting Principles reduce Defendant's cost of sale for a case of Product sold by Defendant in a Paired Transaction. For avoidance of doubt, Defendant's existing supplier support

practices as of the date of this Order—consisting of case support, discount support, and chargeback support referenced in Southern Glazer's Wine and Spirits, LLC's Presentation to the Federal Trade Commission dated March 14, 2024—constitute Supplier Support.

U. "Supplier Support Differential" means, for a Paired Transaction, the difference between the Supplier Support allocated to the In-Commerce Retailer and the Supplier Support allocated to the Covered Retailer.

V. "Temporal Proximity" means that the invoice dates, as recorded in Defendant's transactional data, of the sale to the Covered Retailer and the sale to the In-Commerce Retailer in a Paired Transaction are:

1. Within 75 days of each other for In-Commerce Retailers identified in Non-Public Appendix B; or
2. Within 45 days of each other for all other In-Commerce Retailers.

## ORDER

## I. PROHIBITED CONDUCT

**IT IS FURTHER ORDERED** that:

A. Defendant shall not sell Products to one or more In-Commerce Retailers and a Covered Retailer that result in a set of Excess Payments from Discriminatory Paired Transactions that, considered together, exceed the Enforcement Threshold; *provided, however,* that it is not a violation of this Paragraph I.A. if Defendant establishes a reserved defense identified in Section IV, as provided in that Section.

B. Solely for purposes of this Order and any action to enforce this Order, and not for any other purpose or in any other litigation, investigation, or proceeding before any court or agency, aggregated Excess Payments from Discriminatory Paired Transactions involving the same Covered Retailer exceeding the Enforcement Threshold shall be deemed sufficient, subject to the defenses reserved in Section IV, (1) to state a *prima facie* claim of injury to competition as

to that Covered Retailer within the meaning of the Robinson-Patman Act; and (2) to state a *prima facie* claim of an Order violation.

## II. CURE PROCEDURE

**IT IS FURTHER ORDERED** that:

A. Upon identifying an alleged violation of Section I of this Order, the Monitor shall issue written notice to Defendant specifying the Discriminatory Paired Transactions that compose the alleged violation and the required Cure Payment owed to the Covered Retailer.

B. Defendant may cure the set of identified Discriminatory Paired Transactions by paying the Covered Retailer 1.5 times the full Excess Payment for each and all of the Discriminatory Paired Transactions that compose the alleged Order violation within 60 days of receiving notice (the "Cure Payment"). Defendant must pay 1.5 times the full Excess Payment for each Discriminatory Paired Transaction; partial payments do not cure an alleged violation.

C. Defendant shall make Cure Payments to the Covered Retailer by check, Automated Clearing House Transfer, or any other form of verifiable payment as mutually agreed by Defendant and the Covered Retailer.

D. Defendant's election to make a Cure Payment shall not constitute an admission that Defendant violated this Order or any law.

E. Each Cure Payment shall be accompanied by a copy of the public version of this Order and a letter in the form of Appendix C. Defendant shall:

1. Deliver these materials to the Covered Retailer via a delivery service with a tracking number; and
2. Provide a complete copy of the letter to the Monitor and to Commission staff via email transmittal.
3. Provide notice to the Commission if the Covered Retailer has not verifiably received the Cure Payment (*e.g.*, did not timely cash the check issued by Defendant), in which case the Commission or Monitor shall

direct the appropriate disposition of the Cure Payment, and Defendant's timely tender shall satisfy its cure obligation.

## III. REMEDY IF DEFENDANT DOES NOT CURE

**IT IS FURTHER ORDERED** that:

A. If Defendant declines or fails to exercise its option to cure (the "Cure Option"), the Commission may bring an Order enforcement action. If the Commission prevails in an Order enforcement action, Defendant shall pay the Covered Retailer two times the full Excess Payment for each of the Discriminatory Paired Transactions that compose the Order violation. The two-times payment to the Covered Retailer shall be without prejudice to any other relief the Commission may wish to seek, and the Court may decide to grant, in an Order enforcement action.

B. Payment shall be made within 10 days of entry of judgment unless the Court orders otherwise.

## IV. RESERVED RIGHTS AND DEFENSES

**IT IS FURTHER ORDERED** that:

A. In any enforcement action brought by the Commission for an alleged Order violation, Defendant reserves the right to assert the following defenses under the Robinson-Patman Act:

1. *Functional Availability*. Defendant reserves the right to assert that the challenged pricing or deals were functionally available to the Covered Retailer. The Commission reserves the right to assert that the challenged pricing or deals were not functionally available, including where they were not affirmatively communicated to or not realistically or practically attainable by the Covered Retailer. Each party may raise any argument at law or in fact relevant to this defense, including with the Monitor in consultation with the parties.

2. *Meeting Competition*. Defendant reserves the right to assert, and bears the burden of proving by a preponderance of the evidence, the meeting competition defense under Section 2(b) of the Robinson-Patman Act. Each party may raise any argument at law or in fact relevant to this defense, including with the Monitor in consultation with the parties.

3. *Changing Market Conditions*. Defendant reserves the right to assert, and bears the burden of proving by a preponderance of the evidence, that changed market conditions under Section 2(a) of the Robinson-Patman Act—including good faith sales in discontinuance of business in the goods concerned or closeout sales—account for any Net Price Differential exceeding the Safe Harbor. Each party may raise any argument in law or in fact relevant to this defense, including with the Monitor in consultation with the parties.

B. Where provisions of this Order define terms or operationalize elements or defenses applicable to a Robinson-Patman Act violation, those provisions govern and there are no additional rights or arguments reserved.

C. To the extent not addressed in this Order, both Defendant and the Commission retain all arguments available at law or supported by the facts.

## V. AFFIRMATIVE DEFENSE DOCUMENTATION

**IT IS FURTHER ORDERED** that:

A. Defendant shall retain contemporaneous business documents sufficient to support any affirmative defense it wishes to assert, including documentation of Supplier Support used to justify any Net Price Differential. Such documentation shall reflect the amount, quantity, customer, product, and the conditions, parameters, rules, or requirements associated with the Supplier Support. Defendant may determine the personnel responsible for retaining such documentation.

B. Defendant shall retain documentation for 3 years after a transaction with an In-Commerce Retailer resulting in a Net Price Differential in a Paired Transaction and shall make such documentation available to the Monitor within 30 days following a request. Defendant may seek an extension of this period from the Monitor for good cause shown.

## VI. NOTIFICATION REQUIREMENT

**IT IS FURTHER ORDERED** that Defendant shall:

A. Within 30 days of entry of this Order, provide a copy of this Order to all current Executive and Commercial Staff, and Board Members.

B. Provide a copy of this Order to any individual who assumes an Executive or Commercial Staff position within 30 days of assuming such role.

## VII. ANTI-CIRCUMVENTION

**IT IS FURTHER ORDERED** that:

A. Defendant shall not knowingly engage in any transaction, program, pricing, practice, accounting treatment, or other device that directly or indirectly seeks to evade, defeat, or frustrate the requirements of this Order. If the Monitor concludes that such an attempt has been made, it shall be disregarded, and compliance will be assessed based on the substance and economic reality of the transaction or conduct. Before reaching such a conclusion, the Monitor shall provide Defendant written notice of the basis for the potential finding and a reasonable opportunity to respond.

B. Defendant shall not make changes to its Supplier Support practices that seek to evade, defeat, or frustrate the requirements of this Order.

C. Any material change to Supplier Support practices from the specific forms used by Defendant as of the date this Order is entered must be:

1. Disclosed in writing to and approved by the Monitor before it may be used to justify a Net Price Differential; and

2. Supported by contemporaneous documentation demonstrating supplier funding. Absent such documentation, the support shall be treated as Defendant-funded for purposes of this Order.

D. Compliance Program Requirements

Defendant shall design, maintain, and operate a compliance program to ensure compliance with the Robinson-Patman Act and to prevent circumvention of this Order ("Compliance Program"), and as part of such program shall:

1. Design, maintain, and operate a Robinson-Patman Act compliance program and authorize an appropriate officer or employee to perform all relevant tasks in supervision of Defendant's compliance with such program (the "Compliance Officer").

2. Provide in-person or online compliance training concerning Defendant's obligations under this Order and an overview of the Robinson-Patman Act to all Executive and Commercial Staff:

   a. Within 60 days after the entry of this Order;

   b. Within 60 days of any employee assuming an Executive and Commercial Staff position; and

   c. Annually thereafter.

3. Maintain policies and procedures:

   a. Allowing employees to ask questions or report potential violations of this Order or the Robinson-Patman Act confidentially and without fear of retaliation of any kind;

   b. Governing disciplinary steps for failure to comply with this Order and the Robinson-Patman Act; and

   c. Ensuring retention of documents and records sufficient to record Defendant's compliance with its obligations under this Section, including records showing that Executive and Commercial Staff have received all trainings required under this Order.

4. The Monitor may meet with the Compliance Officer annually to discuss the program and shall have full access to non-privileged compliance policies, training materials, and records. For the avoidance of doubt, compliance policies and training materials developed and administered pursuant to Section VII of this Order circulated to employees broadly, such as to Executive and Commercial Staff as required under this Section VII, are deemed non-privileged for purposes of this Order.

## VIII. MONITOR

**IT IS FURTHER ORDERED** that:

A. At any time after this Order is entered, the Commission shall appoint a Monitor to ensure that Defendant expeditiously complies with all of its obligations and performs all of its responsibilities as required by the Order. The Commission and Defendant shall jointly select the Monitor. The Commission and Defendant also shall jointly select an alternate Monitor in the event the initial Monitor becomes unable to perform his or her responsibilities during the term of the Order. If Defendant has not opposed, in writing, the selection of a proposed Monitor within 21 days after notice by Commission staff to Defendant of the identity of any proposed Monitor, Defendant shall be deemed to have consented to the selection of the proposed Monitor.

B. Not later than 30 days after appointment of the Monitor, Defendant shall execute, subject to the prior approval of the Commission, which approval shall not be unreasonably withheld, an agreement granting the Monitor all rights and powers necessary to monitor Defendant's compliance with this Order ("Monitor Agreement").

C. The Monitor shall serve during the term of this Order. If the initial Monitor cannot serve during the full term of this Order, the alternate Monitor shall serve for the duration of the Order after the initial Monitor becomes unable to perform his or her responsibilities. If neither the initial Monitor nor the alternate Monitor

is able to serve, the Commission and Defendant shall jointly select a replacement Monitor. The Commission may at any time terminate the requirement to have a Monitor if it concludes that a Monitor is no longer necessary to accomplish the purposes of this Order.

D. Defendant shall consent to the following terms and conditions regarding the powers, duties, authorities, and responsibilities of the Monitor:

1. The Monitor shall have the power and authority to monitor Defendant's compliance with the terms of this Order and shall exercise such power and authority and carry out the duties and responsibilities of the Monitor in a manner consistent with this Order. The Monitor shall, in consultation with the parties, observe, monitor, and report on Defendant's compliance with its obligations under this Order.

2. The Monitor shall determine whether the Net Price Differential for any Paired Transaction exceeds the sum of the Safe Harbor and any Supplier Support Differential and whether aggregated Excess Payments from Discriminatory Paired Transactions involving the same Covered Retailer exceed the Enforcement Threshold within any 12-month reporting period. In determining whether to issue a notice of an alleged violation under Paragraph II.A, the Monitor may consider any defense reserved in Section IV that Defendant presents that bears on whether the identified transactions constitute an alleged violation of Paragraph I.A. Any determination by the Monitor concerning an issue under Section IV shall be solely for purposes of administering the Cure Procedure and shall not finally adjudicate that issue or bind any Party in an enforcement action.

3. For good cause shown, the Monitor shall have the authority, in consultation with the parties, to (i) increase the amount of the Enforcement Threshold, including for inflation and substantial changes in regulatory or market conditions; (ii) exclude Paired Transactions or modify payments to

Covered Retailers based upon non-comparable or outlier transactions involving retailers that engage in Sub-Distribution of wine and spirits to other retailers for on- or off-premise sales, except in South Carolina or Texas; and (iii) exclude Paired Transactions if, at the time of the relevant transactions, Defendant in good faith and based on information reasonably available to it does not classify the retailer at issue as a Covered Retailer under clause (2) or clause (3) of the definition of Covered Retailer, *provided that* Defendant discloses in the relevant semi-annual Compliance Report those retailers that it does not classify as Covered Retailers. If the Monitor observes any action that could be considered gamesmanship by a Covered Retailer that may be associated with payments to that Covered Retailer under this Order, it should report such actions to the Commission.

4. Subject to any demonstrated legally recognized privilege, the Monitor shall have full and complete access to Defendant's personnel, books, documents, records kept in the normal course of business, facilities and technical information, and such other relevant information as the Monitor may reasonably request, related to Defendant's compliance with its obligations under this Order. Defendant shall cooperate with any reasonable request of the Monitor and provide a response within a reasonable amount of time, and shall take no action to interfere with or impede the Monitor's ability to monitor Defendant's compliance with this Order.

5. The Monitor shall have the authority to monitor and report to the Commission any effort to circumvent this Order by Defendant.

6. The Monitor shall serve, without bond or other security, at the expense of Defendant, on such reasonable and customary terms and conditions as are set forth in the Monitor Agreement. The Monitor shall have authority to employ, at the expense of Defendant, such consultants, economists,

accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities. The Monitor shall account for all expenses incurred, including fees for services rendered, subject to the terms of the Monitor Agreement and approval of Commission staff, with copies of all invoices and statements provided to Defendant.

7. Defendant shall indemnify the Monitor and hold the Monitor harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Monitor's duties, including all reasonable fees of counsel and other reasonable expenses incurred in connection with the preparation for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from gross negligence or willful misconduct by the Monitor, or from the Monitor's grossly negligent or willful breach of its confidentiality obligations.

8. The Monitor Agreement shall provide that, within 60 days from the date the Monitor is appointed pursuant to this Section VIII, and semiannually thereafter, the Monitor shall report in writing to the Commission concerning performance by Defendant of its obligations under the Order.

9. Defendant may require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however,* such agreement shall not restrict the Monitor from providing any information to the Commission.

E. The Commission may, among other things, require the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign an appropriate confidentiality agreement relating to the

Commission's materials and information received in connection with the performance of the Monitor's duties.

F. The Amended Stipulated Protective Order (Dkt. 83) is hereby modified to permit the Commission to provide the Monitor with any documents or data produced or deemed produced by Defendant in this litigation.

G. The Monitor shall notify the Commission in writing, no later than 5 days in advance of entering into any arrangement that creates a conflict of interest, or the appearance of a conflict of interest, including a financial, professional or personal conflict. If the Monitor becomes aware of such a conflict only after it has arisen, the Monitor shall notify the Commission as soon as the Monitor becomes aware of the conflict;

H. If, for good cause shown, the Commission determines that the Monitor has ceased or failed to act diligently, the Commission may terminate the Monitor and move to the alternate Monitor. If the Commission determines that the alternate Monitor has ceased or failed to act diligently, the Commission may appoint a substitute Monitor, subject to the consent of Defendant.

I. The Commission may, on its own initiative or at the request of the Monitor, request that the Court issue such additional orders or directions to the Monitor, as may be necessary or appropriate to (1) effectuate the terms of this Order, and (2) enable the Monitor to perform his or her duties under this Order.

## IX. REPORTING AND DATA REQUIREMENTS

**IT IS FURTHER ORDERED** that Defendant shall submit verified written reports and data ("Compliance Reports") to the Monitor and Commission staff in accordance with the following:

A. Defendant shall submit:

1. An interim Compliance Report 60 days after the Order is entered; and
2. Semi-annual Compliance Reports to be filed on February 15 and August 15 of each year for the Term of this Order.

B. The Interim Compliance Report shall set forth in detail the manner and form in which Defendant has complied and is complying with this Order. Conclusory statements that Defendant has complied with its obligations under this Order are insufficient. Among other information or documentation, Defendant shall include:

1. A full description of the measures Defendant has implemented or plans to implement to ensure that it has complied or will comply with each Section of this Order;

2. The name and contact information of the designated Compliance Officer; and

3. A list of the Executives and Commercial Staff who received copies of the Order and Complaint and the required Compliance Training.

C. Each semi-annual Compliance Report shall contain sufficient information, data, and documentation to enable the Monitor and the Commission to determine independently whether Defendant is in compliance with this Order. Conclusory statements that Defendant has complied with its obligations under this Order are insufficient. Among other information or documentation, Defendant shall include:

1. A full and complete description of the measures Defendant has implemented or plans to implement to ensure that it has complied or will comply with each Section of this Order;

2. A list of all Cure Payments made during the reporting period, identifying for each Cure Payment the Covered Retailer, payment method, amount, date issued, and confirmation that the Covered Retailer received the Cure Payment;

3. A list of the Executive and Commercial Staff who received a copy of the Order and who received the required compliance training during the reporting period;

4. A list of Defendant's personnel responsible for retaining the Affirmative Defense Documentation required in Section V of this Order; and

5. Sales and transaction data covering the reporting period for each Relevant State necessary for the Monitor to identify and analyze any Net Price Differential in any Paired Transaction, including Gross Profits, Deal ID, Price 2.0, and Retail License data sets comparable to the data sets produced by Defendant in this action (*see, e.g.*, SGWS-00018535; SGWS-19773709; SGWS-18719927-60; SGWS-00034388-89; SGWS-00034394-409; SGWS-15168947-56; SGWS-16265796-804; SGWS-00034390; SGWS-19773710; SGWS-21773841-86; SGWS-21773887-95; SGWS-21775506-08; SGWS-21773835; SGWS-21773796-821; SGWS-21775458-90; SGWS-21773836; SGWS-21773831-34; and SGWS-21773837-40), or in such other form or format as Defendant and the Monitor may agree, and data sufficient to identify all Supplier Support associated with any Net Price Differential.

D. Within 60 days after the Order is entered, Defendant shall submit to the Monitor a copy of Southern Glazer's Wine and Spirits, LLC's Presentation to the Federal Trade Commission dated March 14, 2024; and offer a briefing to the Monitor on Defendant's anticipated format for preparing and submitting the Compliance Report.

E. For a period of 3 years after filing a Compliance Report, Defendant shall retain all final versions of written communications with each party identified in each Compliance Report that are material to Compliance with this order and all non-privileged internal memoranda, reports, and recommendations concerning fulfilling obligations under this Order during the period covered by such Compliance Report. Defendant shall provide copies of these documents to the Commission or the Monitor upon request.

F. Defendant shall verify each Compliance Report in the manner set forth in 28 U.S.C. § 1746 by the Chief Executive Officer or another officer or employee specifically authorized to perform this function. Defendant shall file its Compliance Reports with the Secretary of the Commission at ElectronicFilings@ftc.gov and the Compliance Division at bccompliance@ftc.gov, as required by Commission Rule 2.41(a), 16 C.F.R. §2.41(a). In addition, Defendant shall provide a copy of each Compliance Report to the Monitor.

## X. CHANGE OF CORPORATE CONTROL

**IT IS FURTHER ORDERED** that Defendant shall notify the Commission at least 30 days prior to:

A. Any proposed dissolution of Southern Glazer's Wine and Spirits, LLC;

B. Any proposed acquisition, merger, or consolidation of Southern Glazer's Wine and Spirits, LLC; or

C. Any other change in Defendant, including, but not limited to, assignment and the creation, sale or dissolution of subsidiaries, if such change may materially affect the compliance obligations arising out of this Order.

## XI. ACCESS TO INFORMATION

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, subject to any legally recognized privilege, and upon written request and upon 10 business days' notice to Defendant made to its principal United States offices, registered office of its United States subsidiary, or its headquarters address, Defendant shall, without restraint or interference, permit any duly authorized representative of the Commission:

A. Access, during business office hours of Defendant and with the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of Defendant related to compliance with the

Order, which copying services shall be provided by Defendant at the request of the requesting authorized representative(s) and at the expense of Defendant; and

B. To interview officers, directors, or employees of Defendant, who may have counsel present, regarding such matters.

## XII. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

## XIII. EXPIRATION OF THE ORDER

**IT IS FURTHER ORDERED** that this Order shall expire 6 years after the date it is entered.

## XIV. ENFORCEMENT OF THE ORDER

**IT IS FURTHER ORDERED** that:

A. The Commission retains and reserves all rights to enforce the provisions of this Order, including the right to seek an order of contempt from the Court. Defendant agrees that in any civil contempt action, any motion to show cause, or any similar action brought by the Commission regarding an alleged violation of this Order, the Commission may establish a violation of this Order and the appropriateness of any remedy therefor by a preponderance of the evidence, and Defendant waives any argument that a different standard of proof should apply.

B. The Order should be interpreted to give full effect to the purposes of Section 2 of the Clayton Act. Defendant agrees that it may be held in contempt of, and that the Court may enforce, any provision of this Order that, as interpreted by the Court in light of these purposes and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Order should not be construed against either party as the drafter.

C. For a period of 2 years following the expiration of this Order, if the Commission determines that Defendant violated this Order before it expired and Defendant

declines or fails to exercise the Cure Option, the Commission may file an enforcement action in this Court against Defendant seeking the remedies set forth in Section III of this Order and any additional relief needed to ensure Defendant complies with the terms of this Order.

## XV. COSTS

Each party shall bear its own costs.

SO ORDERED this ________ day of __________, 2026.

______________________________
Honorable Fred W. Slaughter
United States District Judge

# NON-PUBLIC APPENDIX A

## Operational Expenses by State

[redacted]

## NON-PUBLIC APPENDIX B

### Temporal Proximity for In-Commerce Retailers Within 75 Days

[redacted]

# PUBLIC APPENDIX C

## Written Notice to Covered Retailers

[Date]

[Covered Retailer]
[Address]
[Address]
[Address]

Re: *Federal Trade Commission v. Southern Glazer's Wine and Spirits, LLC*, No. 8:24-cv-02684-FWS-ADS (C.D. Cal.)

[Covered Retailer]:

You are receiving this letter and a payment of $[AMOUNT] because Southern Glazer's Wine and Spirits, LLC ("SGWS") charged you prices for certain wine and spirits purchases that were higher than prices charged to large chain retailers in your area and exceeded permissible price differentials under a court-approved agreement (called a consent order) between the Federal Trade Commission under President Donald J. Trump and SGWS.

In December 2024, the Commission sued SGWS in federal court, alleging that SGWS charged independent retailers higher prices than large chain retailers in violation of the Robinson-Patman Act, a federal law that prohibits certain kinds of price discrimination. A public copy of the Commission's Complaint is available on the FTC's website.[1]

On [DATE], the Court approved a consent order ("Order") that imposes certain obligations to resolve the parties' legal claims. As part of the Order, if SGWS charges retailers like you too much relative to large chains in your area, it may pay you money to account for the differential pricing, as well as a penalty equal to fifty percent of the overcharge. The Order also appoints a Monitor to oversee SGWS's compliance and ensure that you receive any payments you are entitled to under the Order. A copy of the Order is available on [FTC WEB LINK].[2] Any capitalized terms used in this letter follow the definitions used in the Order.

---

[1] https://www.ftc.gov/system/files/ftc_gov/pdf/redacted_version_of_complaint_2.10.2025_dkt._57.pdf.
[2] [Web address].

**Payment Owed to You**

The Order provides that when the Monitor determines that SGWS's pricing did not meet the requirements of Section I of the Order, SGWS may cure the alleged violation by reimbursing a Covered Retailer like you. SGWS's obligations relating to payments owed to Covered Retailers are set out in Sections II and III of the Order.

After reviewing SGWS's pricing records, the Monitor identified an alleged violation of the Order and determined that SGWS charged you Net Price Differentials totaling $[AMOUNT]. The products at issue are identified in the attached.

In accordance with the Order, SGWS is paying you 1.5 times the Excess Payment it charged another retailer or retailers, for a total of $[AMOUNT]. [Your check is enclosed/An electronic payment was issued on [DATE] via [METHOD] with [CONFIRMATION NUMBER]].

**Where to Get More Information**

You can read about and download the Order as well as the Complaint from the FTC's website.[3] If you have any questions about this payment or concerns in the future about SGWS's compliance with the Order, you may contact:

- The Commission: Janet Kim, 202-326-2874, jkim3@ftc.gov; Jennifer Lee, 202-326-2246, jlee@ftc.gov; Ben Lorigo, 202-326-3717, slorigo@ftc.gov
- The Monitor: [MONITOR NAME], [PHONE NUMBER], [E-MAIL ADDRESS]
- SGWS: Your usual SGWS sales contact or [NAME] , [PHONE NUMBER], [E-MAIL ADDRESS].

Sincerely,

/s/________________________
[Name]
[Title]

[3] https://www.ftc.gov/legal-library/browse/cases-proceedings/2110155-southern-glazers-wine-spirits-llc-ftc-v.